Thomas ALGIE, Anthony Amelio, Wallace Carnegie, Joseph A. Coppola, William Crouch, George Eccleston, Edward Edelson, Joseph Fezza, Joseph Gleitman, Jack Gold, Henrietta Greco, Calvin Gum, Dean Heunisches, Vincent Ingoglia, James Patrick, Carl Reddo, Pedro Richards, Stephen G. Safka, Jr., John H. Sharp, Eugene Stanley, Mark Stein, George Tropiano, and Aristedes Zagorianos, Plaintiffs,

v.

RCA GLOBAL COMMUNICATIONS, INC. and MCI International, Inc., Defendants.

No. 89 Civ. 5471 (MJL).

United States District Court, S.D. New York.

April 12, 1994.

John C. Lankenau, Lankenau, Kovner & Kurtz, New York City.

Christine H. Perdue, Hunton & Williams, Fairfax, VA, for defendants.

## MEMORANDUM AND ORDER

DOLINGER, United States Magistrate Judge:

This lawsuit is being prosecuted by twenty-three former employees of RCA Global Communications, Inc. ("RCAG"). All were terminated, effective May 30, 1988, following the stock purchase of RCAG by MCI Communications Corporation ("MCIC") on May 16, 1988.[1] Asserting four claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), plaintiffs complain principally that they were entitled to severance benefits under the RCAG severance benefits plan, and they seek the difference between those benefits and the payments that were in fact made to them under the less generous severance plan of MCIC. In addition, thirteen plaintiffs assert a claim

---

1. MCIC was originally named as a defendant in this action. Plaintiffs have now moved for and been granted leave to substitute MCI International, Inc., a subsidiary of MCIC, as defendant. (*See* Endorsed Order dated April 11, 1994.)

under section 104 of ERISA based on defendants' alleged failure to provide requested plan documents and information in a timely fashion.

Following the completion of discovery in this case, plaintiffs have moved for summary judgment on three of their four claims. In their turn, defendants seek summary judgment with respect to each of plaintiffs' four claims.

### A. Plaintiffs' Claims

Plaintiffs were all long-term non-unionized employees of RCAG. They allege that RCAG was the sponsor and administrator of a severance benefits plan that was in effect at the time that the stock of RCAG was sold to MCIC. According to plaintiffs, they were informed within one to three days after the May 16, 1988 closing that they were being terminated effective May 30, 1988, and in fact they were so terminated, assertedly without ever having been called upon to perform any services for the purchasing corporation or its subsidiaries. Claiming that they were therefore entitled to benefits under the RCAG severance plan, plaintiffs allege that they were paid substantially less, on the purported basis that only the MCIC severance plan applied to them.

Based on these events, the "Third Amended Complaint" [2] asserts three claims for denial of benefits. The first claim is asserted under 29 U.S.C. § 1132(a)(1)(B) and is premised on the contention that, at the time of termination, plaintiffs were still participants in the RCAG severance plan and entitled to be paid under its terms rather than at the lower level authorized by the MCIC plan. (See Third Amended Complaint at ¶¶ 23–25) (Pltffs' Exh. 1). The second claim, based on the same denial of benefits, asserts that defendants breached their fiduciary duties under 29 U.S.C. § 1104. The remaining claim devoted to the denial of severance benefits is the fourth claim, which alleges that defendants conspired to deny plaintiffs their benefits under the RCAG plan by deliberately withholding the announcement of their termi-

nation until after the closing of the stock sale of RCAG. Based on their contention that they were, in effect, "hired to be fired," plaintiffs asserted a claim under 29 U.S.C. § 1140 for unlawful discharge or discrimination intended to interfere with their right to benefits. (See Third Amended Complaint at ¶ 48.) In response to defendants' summary judgment motion, however, plaintiffs concede that this claim should be dismissed for lack of proof of intent. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at pp. 2–3) ("Pltffs' Memo.Opp.").

The remaining claim, asserted by thirteen of the plaintiffs, is premised on the alleged failure of RCAG to comply with a request for information made on those plaintiffs' behalf by their attorney. Plaintiffs allege that RCAG failed to turn over a number of plan documents, including "the terminal report and a board of directors' resolution of defendant RCA Globcom purporting to terminate the RCA Globcom Severance Plan" (Third Amended Complaint at ¶ 38), in violation of 29 U.S.C. § 1024(b)(4). They therefore seek a statutory penalty of $100.00 per day for each day of delay in providing the requested items.

### B. The Factual Record

Since both sides have moved for summary judgment, our principal focus must be on the extent of the undisputed factual record. The following summary reflects, in principal part, those purportedly material facts that are not in genuine dispute. To the extent that any potentially significant facts are not conceded, I will note the nature of the dispute.

#### 1. The Events Leading to Termination

Until the May 16, 1988 stock purchase by MCIC, RCAG was a wholly-owned subsidiary of GE Subsidiary 21, Inc., which was in turn a wholly-owned subsidiary of General Electric Company ("GE"). (See Pltffs' Exh. 5; Defts' Exh. 2.) RCAG was thus separate and distinct from RCA Corporation—apparently another subsidiary of GE—although

---

**2.** Although denominated the Third Amended Complaint, the most recent pleading appears to

be the fourth version of an amended complaint.

the precise relationship between the two is not specified in the record.

The plaintiffs all worked for RCAG for many years as non-union employees in various departments of the company.[3] By no later than 1984 RCAG had adopted an employee severance benefit plan for non-represented salaried employees. (*See* Defts' Answers to Pltffs' Second Set of Interrogatories # 19.) The plan was both sponsored and administered by RCAG. (*See* Pltffs' Exh. 3.) Under its terms, an eligible employee would be entitled to payments measured in terms of years of service and salary, with a maximum cap on benefits of 52 weeks of pay. (Pltffs' Exh. 4 at p. 3.) According to the "Procedure" that described the RCAG "Severance Allowance for Non–Represented Employees," the benefits would be paid if the employee's "active employment" were "terminated" in any of the following circumstances:

 a. Reduction in force.

 b. Organizational realignment.

 c. Discontinuance of an operation.

 d. Loss of contract or sale of an operation to another company.

 e. Lack of work.

 f. Location closing.

(Pltffs' Exh. 4 at p. 1.)[4] The plan also specified several situations in which benefits would not be paid to laid-off employees. As summarized by the SPD, it provided for no benefits

 \* \* \* \* \* \*

if you: are offered a job by a company to which RCA Global Communications, Inc. has lost a contract or sold a business operation in which you have been working at substantially [the] same or higher level of work and at a level of compensation and benefits which RCA Global Communica-

tions, Inc. deems to be substantially the same or better than you are receiving. (Defts' Exh. 17 at p. 2.)

As for the amount of severance benefits payable under the plan, employees with a total service credit of two to fifteen years would be paid two weeks of base salary "for each completed year of service." (*Id.*) Employees with a service credit of sixteen to twenty-one years were entitled to receive three weeks of salary "for each completed year of service over 15 years up to and including 21 years." (*Id.*) For employees with a service credit of twenty-two or more years, the specified benefits were "52 weeks (Maximum)." (*Id.*)

The plan provided that "RCA Globcom may amend or terminate this Policy at any time." (Pltffs' Exh. 4 at p. 4.) It did not, however, specify any procedure for such amendment or termination.

On September 3, 1987 it was announced that GE and MCIC had signed a letter of intent for the sale of a GE subsidiary to MCIC. (*See* Defts' Exh. 1.) On October 29, 1987, GE and MCIC signed a Stock Purchase Agreement under which, subject to approval by the Federal Communications Commission, GE agreed to sell to MCIC all outstanding capital stock in a wholly-owned subsidiary identified as GE Subsidiary, Inc. 21 or "Globcom Prime." (Defts' Exh. 2 & Pltffs' Exh. 5 at ¶ 1.1.) Globcom Prime was the parent of RCAG, which was its only subsidiary. (*Id.* at ¶¶ 1.1, 3.1(e).)

The agreement specifically referred to, and included as a schedule, a list of "[a]ll Current Benefit Plans" for which any "member of the Globcom Group" was a sponsor. (*Id.* at ¶ 3.1(*o*) & Sch. F.) Among the plans so listed was the severance benefits plan sponsored and administered by RCAG.

In its specification of covenants, the agreement obligated the seller to accept certain undertakings with respect to some of the

---

**3.** Plaintiffs' service with RCAG ranged from 18 to 41 years. (*See* Third Amended Complaint at ¶ 6.)

**4.** The Summary Plan Description ("SPD") for the RCAG plan also contained a provision for

benefits in certain circumstances involving a voluntary separation after notice by the company that it had excess employees in a given job classification at a specified location. (Defts' Exh. 17 at p. 1.)

listed plans. Thus, section 4.3(h) stated as follows:

> Globcom [RCAG] and certain other members of the Globcom Group are employers included and participating in the RCA Retirement Plan for Employees of RCA Corporation and Subsidiary Companies ("RCA Retirement Plan"), RCA Income Savings Plan ("RCA Savings Plan"), Retirement Plan for Certain International Employees of Certain Subsidiaries of RCA ("Offshore Plan"), and welfare benefit plans for employees of RCA Corporation and its present or former subsidiary companies ("RCA Welfare Benefit Plans").

Apart from noting that Schedule F contained a listing of all of these RCA Corporation plans, section 4.3(h) specified the agreed-upon resolution of the Globcom Group's participation in those plans.

With respect to the RCA Retirement Plan, the contract provided that, "[e]ffective at or immediately prior to the Closing Date, employee-members of the Globcom Group will no longer be eligible to participate in the RCA Retirement Plan because the Globcom Group will no longer be subsidiaries of Seller and the Seller will cause each member of the Globcom Group included in the RCA Retirement Plan to terminate the Plan as to its respective employees." (*Id.* § 4.3(h)(i).)[5] The contract addressed the RCA Savings Plan in similar terms, stating that "[e]ffective at or immediately prior to the Closing Date, employee-members of the Globcom Group will no longer be eligible to participate in the RCA Savings Plan because the Globcom Group will no longer be subsidiaries of Seller and Seller will cause each member of the Globcom Group that has adopted the RCA Savings Plan for their respective employees to terminate the Plan as to its respective employees." (*Id.* at ¶ 4.3(h)(ii).)

The contract also referred to the "RCA Welfare Benefit Plans." (*Id.* at § 4.3(h)(iii).) With respect to these plans, it provided that "[e]ffective at or immediately prior to the Closing Date, employee-members of the Globcom Group will no longer be eligible to participate in RCA Welfare Benefit Plans because the Globcom Group will no longer be subsidiaries of Seller and the Seller will cause each member of the Globcom Group with employees covered by RCA Welfare Benefit Plans to withdraw and terminate participation in those plans as to its respective employees." (*Id.*)

Section 4.3(h) of the contract made similar reference to the so-called Offshore Plan and to certain Foreign Benefit Plans. (*See id.* at §§ 4.3(h)(iv) & (v).) The contract did not, however, explicitly address plans sponsored and administered by RCAG or other members of Globcom.

In fulfillment of the requirements of section 4.3(h) of the Stock Purchase Agreement, the Board of Directors of RCAG approved a resolution dated January 21, 1988. The resolution provided that,

> effective the Closing pursuant to the Stock Purchase Agreement, dated October 29, 1987, between General Electric Company and MCI Communications Corporation, this Corporation hereby withdraws from participation in and terminates as to its employees the Retirement Plan for the Employees of RCA Corporation and Subsidiary Companies, the RCA Income Savings Plan, the Retirement Plan for Certain International Employees of Certain Subsidiaries of RCA ("the Offshore Plan") and all employee welfare benefit plans administered by RCA Corporation for employees of its present or former subsidiary companies.

(RCAG Consent of Directors, Defts' Exh. 3.) Consistent with the limited scope of section 4.3(h) of the Stock Purchase Agreement, this resolution made no reference to and did not purport to terminate or otherwise affect any plan sponsored and administered by RCAG itself. (*See also* Dep. of Valerian Podmolik at 105.) Moreover, prior to issuance of this resolution, the President and CEO of RCAG had advised all RCAG employees in writing that the stock purchase would require termination of participation in all RCA Corpora-

---

5. This provision also contained details as to the measurement and disposition of accrued benefits under the RCA Retirement Plan.

tion benefit plans, but he made no reference to terminating the RCAG plans. (*See* Defts' Exh. 5.)

While the parties were waiting for FCC approval, MCIC was prohibited from exerting any direct control over RCAG. (*See* 47 U.S.C. § 310(d).) Nonetheless, during the interim period MCIC began to plan for the eventual takeover of RCAG. One form of planning involved decisions as to how to merge the various departments of RCAG into the pre-existing structure of defendant MCI International, Inc. ("MCII"), a subsidiary of MCIC. As part of this process, in the early Spring of 1988, MCI officials obtained lists of RCAG employees by department and, after consulting with RCAG supervisors, began to make decisions as to which of the RCAG employees would be hired by MCII and which would be let go. (*See* Dep. of Robert Ottman at 30; Dep. of Nicholas Marano at 59; Dep. of Jeffrey Previte at 19–20, 45–47, 54; Dep. of William Pacquin at 49, 51. *See also* Pltffs' Exhs. 10, 13, 14, 16–18.) It is not genuinely disputed that most of these decisions as to personnel had been finalized by the time of the closing on May 16, 1988. (*See, e.g.,* Pltffs' Exh. 12; Marano Dep. at 25–26, 44; Ottman Dep. at 25–26; Previte Dep. at 24–25, 30; Dep. of Fred Briggs at 12, 105.) Defendants do insist that final decisions had not been made prior to the closing as to most, if not all, of the plaintiffs. (*See* Defts' Response to Pltffs' Request to Admit # 75; Answer to Third Amended Complaint at ¶ 44.)

Apart from these hiring and firing decisions, during the waiting period MCIC also decided to take certain preliminary steps to integrate the RCAG staff into its workforce structure. Thus, in evident anticipation of its acquisition of RCAG, MCIC arranged for a series of meetings by its human resources officers with RCAG employees for the purpose of explaining to them the basic terms of the various MCI employee benefit plans. (*E.g.,* Defts' Exhs. 6–8; Pltffs' Exh. 20; EEOC Dep. of Nicholas Marano at 18–22; Marano Dep. at 20–22; Dep. of Dennis Helper at 26.) Plaintiffs all attended these meetings, which were conducted in mid-December 1987 at the RCAG offices in Piscataway, New Jersey. (Dep. of Joseph Coppolla at 5–8.)

The presentations at these meetings were oral, although the MCIC representatives apparently supplemented their statements with the projection of some transparencies. Apart from summarizing the basic terms of the various MCI plans, including the MCIC severance plan, it is not clear what the MCI speakers said to the RCAG employees. In particular, there is no evidence to suggest that they advised those employees that some would be laid off after the closing or that they referred in any specific way to what benefits would be made available to those employees terminated right after the closing of the stock purchase. (*See* Previte Dep. at 79; Marano EEOC Dep. at 19–20.)

In addition, during the waiting period MCIC modified its severance benefits plan in one respect. Unlike the RCAG plan, the MCIC plan calculated benefits of all employees at two weeks of pay for each completed year of service and capped benefits at 30 weeks of pay. (*See* Defts' Exh. 8 at p. 50.) To accommodate its anticipated acquisition of RCAG, however, MCIC amended the plan to give RCAG employees credit for time worked at RCAG. MCIC did not, however, lift the 30–week cap on benefits. (*See* Defts' Exh. 37 at p. 2.)

In March 1988, apparently as a follow-up to the prior meetings with RCAG employees, MCIC sent to all RCAG employees various forms to be filled out for the purpose of enrolling, after the projected closing, in the MCIC benefit plans, as well as W–4 forms to facilitate inclusion in the MCII payroll system. (*See* Pltffs' Exhs. 21–22; Defts' Exh. 10.) As with other RCAG employees, the plaintiffs in this case apparently filled out the necessary forms and returned them to MCII. (*E.g.,* Pltffs' Exh. 23.)

The Federal Communications Commission approved the proposed stock purchase on May 6, 1988. (Pltffs' Exh. 24.) On May 16, 1988 the stock purchase closed without the need for a formal closing meeting.

Immediately after the closing, MCII began to distribute two different categories of letters to RCAG employees. (Pltffs' Exh. 17; Marano EEOC Dep. at 55.) One set, described as welcoming letters, was sent to

those RCAG employees who were to be retained by MCII and integrated into its staff. These letters advised the employee that he was being hired to work for MCII, specified the person's new MCII job classification and salary and informed him of the name of his immediate supervisor and his work location. (*E.g.,* Pltffs' Exh. 29; Marano Dep. at 52.)

The other type of letter, the so-called termination letter, was delivered to those RCAG employees who were not to be retained by MCII. Each of the plaintiffs was given a termination letter dated either May 17 or May 18, 1988. (*See* Pltffs' Exh. 27.) They received those letters either on the date of the letter or within a day of two thereafter. The letters, all of which were on MCII letterhead and signed by Nicholas A. Marano, MCII's Director of Human Resources, stated: "I regret to inform you that the Company will be experiencing a reduction in staff in the next few days. As a result of the reduction, your employment with MCI International will be terminated effective May 30, 1988." The letters went on to state that the employees would receive severance benefits calculated under the MCIC severance benefits plan and would also receive extended health and life insurance coverage under the MCI plans. (*Id.*)

In each instance the individual was instructed that he or she should report for career counselling starting either on May 17 or on May 19, 1988. It is undisputed that none of the plaintiffs was ever classified under the MCII job classification system, and that all were promptly funnelled to the career counselling program. It is also clear that all, with the possible exception of one or two (*see* Dep. of Wallace Carnegie at 59), were instructed not to report to their regular job stations and never performed any work for MCII or, indeed, for any other entity within the MCI family. There is equally no dispute that none was assigned a new salary or advised of any work station to which to report or given a job supervisor.

As for RCAG itself, it was not dissolved. Rather, it was assigned as a subsidiary of Western Union International, itself a subsidiary of MCII. (*See* Defts' Reply to Pltffs' Rule 3(g) Statement at ¶ 21.) Indeed, as

recently as 1990, RCAG filed at least one corporate document with the New York Secretary of State indicating its continued existence. (Pltffs' Exh. 25.) In addition, it is apparent that as of the closing RCAG and its Board had taken no steps to terminate its own severance benefits plan. (Podmolik Dep. at 118.) There is also no evidence that after the closing either RCAG or anyone on its behalf took any action to terminate the plan.

For the period from May 16 to 30, 1988, all of the plaintiffs were paid at their prior RCAG salary levels. For the week from May 16 through 20, each was paid by check issued by RCAG. (Pltffs' Exh. 33.) For the succeeding time period, through May 30, 1988, they were paid by checks issued by MCII. (Pltffs' Exh. 34.) Corresponding to these payments, the plaintiffs later received W–2 forms from RCAG and from MCIC for the two respective time periods between May 16 and 30, 1988. (Pltffs' Exhs. 33, 35.) As for the corporate documentation of plaintiffs' termination, these entries were made on RCAG forms, although plaintiffs' names also appear on computer printouts reflecting the MCII personnel data base. (Pltffs' Exh. 32 & Defts' Exh. 12.)

Defendants insist that, as of May 16, 1988, plaintiffs ceased to be employed by RCAG and became instead employees of MCII. In explanation of the apparent anomalies in the method of payment and recordkeeping, defendants assert in their reply papers that RCAG paid plaintiffs for the week of May 16 because it was the middle of the MCII pay period and that MCII later reimbursed GE for these payments. (*See* Affidavit of Jeffrey A. Previte, sworn to April 13, 1993, at ¶ 4; Defts' Reply to Pltffs' Rule 3(g) Statement at ¶ 26). As for the personnel files, MCII asserts that it chose, "as a matter of convenience," to use RCAG forms to record personnel decisions concerning plaintiffs, even though, as of May 16, 1988, plaintiffs were no longer RCAG employees. (Previte Aff. at ¶ 3.)

### 2. *Post–Termination Events*

Although plaintiffs ultimately received various MCI benefits, they did not obtain the more lucrative severance payments to which

they claimed entitlement under the RCAG severance plan. Accordingly, twelve of them initially hired John Lankenau, Esq. to represent them in dealing with RCAG and MCI. By letter dated November 23, 1988, and addressed to RCAG, Mr. Lankenau requested, on behalf of the twelve individuals that they be paid severance benefits in accordance with the RCAG plan. By the same letter he requested provision "of all plan documents and other plan information." (Pltffs' Exh. 36 at p. 3.) In response, MCII sent counsel a letter dated January 13, 1989 and RCAG responded by letter dated January 16, 1989. (Defts' Exhs. 37, 38.) The January 13 letter, signed on behalf of the MCII Severance Pay Plan Committee,[6] treated the November 23 letter as a request for additional benefits from MCII and declined the request. In so doing MCII stated that the claimants' "employment with RCA Global Communications, Inc. was terminated" on May 30, 1988, and that they had received all the benefits due under the MCII plan. As for possible entitlement to RCAG benefits, the letter referred claimants to RCAG. MCII also enclosed copies of the MCII Plan and its Summary Plan Description. The January 16 letter, written on RCAG letterhead and on behalf of the RCAG Severance Allowance for Non–Represented Salaried Employees, denied plaintiffs' request for benefits under the RCAG plan. In explanation, RCAG stated that the plan "and claimants' participation in that Policy were terminated on May 16, 1988." Accordingly, it concluded, "[a]t the time of claimants' termination of employment on about May 30, 1988, they were no longer participants in the RCA Severance Policy and had no entitlement to a benefit under that policy." (Pltffs' Exh. 38.) In addition, RCAG enclosed a copy of the RCAG "Procedure" for its severance plan, and requested Mr. Lankenau to specify whether he was seeking any additional documents.

In response to this letter, Mr. Lankenau again wrote to RCAG, on January 25, 1989, seeking a variety of documents for the twelve original claimants and for a thirteenth claimant. (Pltffs' Exh. 44.) These included all

documents relating to the claimants' termination and to the termination, if any, of the RCAG severance plan, all filings with the Department of Labor concerning the severance policy and documents reflecting the service credit of each claimant. (*Id.*)

This letter provoked two responding communications, both dated February 16, 1989, one from MCII and the other from RCAG. The MCII letter (Pltffs' Exh. 39) treated counsel's earlier letter as a request for additional MCII severance benefits for the thirteenth claimant and denied the request without commenting on any possible entitlement to RCAG severance benefits. As for the RCAG letter, it too addressed the request for benefits by the thirteenth claimant and denied it on the basis that the severance plan had been terminated on May 16, 1988 and, hence, the claimant was not a participant as of May 30, 1988, when he was terminated. (Pltffs' Exh. 40.)

On February 28, 1989, Mr. Lankenau again wrote to RCAG, appealing on behalf of the thirteenth claimant and asking for the same documents as previously requested on behalf of the first twelve claimants. (Pltffs' Exh. 43.) By letters dated May 5 and May 8, 1989, MCII and RCAG reiterated their denial of additional benefits to any of the thirteen claimants. (Pltffs' Exhs. 41 & 42.) The MCII letter again stated that claimants had been covered by the MCII plan and paid in accordance with its terms. As for RCAG, it reiterated that its plan had been terminated prior to the claimants' termination and that they were not entitled to any benefits under that plan. As for the document request, RCAG enclosed a copy of the SPD and another copy of the RCA Severance Policy "Procedure." (Pltffs' Exh. 42.)

## ANALYSIS

As noted, plaintiffs seek summary judgment on three of their claims, while defendants move for equivalent relief as to all four asserted claims. Before addressing the merits of those claims, we must first consider a defense—or more precisely two versions of a

---

**6.** The MCI severance pay plan is apparently sponsored by MCIC (*see* Defts' Exh. 16 at p. 1), but post-termination correspondence from MCII

described the plan as an MCII plan. (*E.g.*, Defts' Exh. 37.)

defense—proffered by defendants with respect to the three claims for denial of severance benefits. As argued by defendants, they are entitled to judgment on Counts I, II and IV by virtue of either claim or issue preclusion, an effect that is said to arise from a decision of the Ninth Circuit in a case entitled *Pippin v. RCA Global Communications,* 979 F.2d 855, No. 91–16282, unpublished Memorandum (9th Cir. Nov. 20, 1992) (text available on Westlaw, 1992 WL 344962). (*See* Defts' Exh. 25.)

## A. *The Preclusion Defense*

To assess defendants' argument based on the *Pippin* decision, we must first summarize briefly the pertinent facts on which their analysis turns. As will be seen, their argument is unsupported by the facts and the law.

In April 1989 five former employees of RCAG, all of whom resided in California, filed suit in the Northern District of California against both RCAG and MCII. Each had been terminated in the wake of the stock purchase closing under circumstances apparently comparable to those encountered by the plaintiffs in this case, and thus had been paid only under the less generous terms of the MCI severance plan.

As reflected by the First Amended Complaint in *Pippin* (Pltffs' Exh. 58), the plaintiffs there asserted eight claims. The first two most closely resembled the issues involved in the *Algie* case. The first was based on allegations that MCII had determined prior to the closing which RCAG personnel it intended to terminate, and that MCII and RCAG had conspired to deny plaintiffs their benefits under the RCAG plan by the "purported" termination of the RCAG plan at the time of the closing. (First Amended Complaint at ¶ 37.) In reliance on these allegations, the *Pippin* plaintiffs asserted that defendants had engaged in "an unlawful *de facto* revision to and unlawful termination of the Globcom plan for the bad faith purpose of denying specified benefits to plaintiffs, in violation of 29 U.S.C. § 1140." (*Id.* at ¶ 38.) That section prohibits "any person [from] discharg[ing], fin[ing], suspend[ing], expel[ling], disciplin[ing] or discriminat[ing]

against a participant ... for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which each participant may become entitled under the plan [or] this subchapter."

In support of the plaintiffs' second claim, they asserted that they had been terminated by RCAG at the time of the closing and that each had been entitled to RCAG plan benefits. According to plaintiffs, defendants had denied them benefits on the asserted basis that they had been discharged after May 16, 1988, following the termination of the RCAG plan on May 16, 1988. Plaintiffs alleged that this stated "reason was arbitrary and capricious because Globcom knew before May 16, 1988 that plaintiffs' employment would be terminated in conjunction with the sale to MCI." (*Id.* at ¶ 43.) Based on these allegations, plaintiffs asserted a separate claim for "bad faith" or "arbitrary and capricious" denial of benefits in violation of 29 U.S.C. § 1140. (*Id.* at ¶ 44.)

Plaintiffs' third claim was for age discrimination under 29 U.S.C. § 626 and California law. The fourth claim, asserted only by one plaintiff, charged discrimination on the basis of national origin, in violation of Title VII, 42 U.S.C. § 2000e–2, and California law. The balance of plaintiffs' complaint in *Pippin* invoked state law to assert claims of breach of contract (First Amended Complaint at ¶¶ 67–70, 72–76), breach of a covenant of good faith and fair dealing (*id.* at ¶¶ 78–80), and violation of section 201 of the California Labor Code. (*Id.* at ¶¶ 82–87.)

In August 1989, the plaintiffs in this case filed their original complaint. As is evident from that pleading, although they too complained of the denial of RCAG severance benefits, they asserted no claim under 29 U.S.C. § 1140 or any state law, but rather pled three ERISA claims, for denial of benefits in violation of 29 U.S.C. § 1132(a), for breach of fiduciary duty in violation of 29 U.S.C. § 1104, and for denial of plan information, in violation of 29 U.S.C. § 1024(b)(4). (Pltffs' Exh. 62.) It also bears emphasis that the record contains no evidence that either the plaintiffs in this case or their attorney,

John Lankenau, Esq., were aware at the time of the pendency of the *Pippin* litigation.

In December 1989 the district court in *Pippin* granted in part defendants' motion to dismiss. (Defts' Exh. 23.) Judge Smith dismissed the first claim, for bad-faith termination of the RCAG plan, since an employer has the right under ERISA to terminate an employee welfare benefit plan. She also dismissed two state-law claims as preempted by ERISA.

Ultimately the only claim to survive in *Pippin* was the second, alleging a bad-faith denial of benefits. The parties then cross-moved for summary judgment, and by Memorandum dated Feb. 6, 1991 Judge Smith granted plaintiffs' motion. (Defts' Exh. 24.) Finding that plaintiffs' had been "hired to be fired" (Memorandum at p. 449), the court held "that defendants' conduct toward plaintiffs violated section 1140" since they "structured the employment relationship with plaintiffs, at least in part, 'for the purpose of' depriving them of full severance benefits under the RCAG Plan." (*Id.* at p. 448.)

The evidence in the record indicates that it was only after the issuance of this decision in *Pippin* that the *Algie* plaintiffs' counsel learned of the *Pippin* litigation, when the attorneys representing the *Pippin* plaintiffs notified him of the lawsuit and the successful outcome in the district court. (*See* Affirmation of John C. Lankenau, executed April 16, 1993, at ¶¶ 11–19; Reply Affirmation of Wayne N. Outten, Esq., executed April 26, 1993, at ¶ 7.) Based on that decision, which was published at 756 F.Supp. 446 (N.D.Cal. 1991), plaintiffs in *Algie* successfully moved to amend the latest version of their complaint to incorporate, as their fourth claim, the section 1140 claim that Judge Smith had upheld in California. (*See* 1992 WL 367080, Memorandum & Order dated November 25, 1992.)

Subsequently defendants appealed the decision of Judge Smith in *Pippin*. In an unpublished memorandum decision filed November 20, 1992, the Ninth Circuit reversed and ordered entry of summary judgment for defendants. (Defts' Exh. 25.) In its brief discussion, the Court addressed the second claim as simply one for denial of benefits under 29 U.S.C. § 1132(a)(1)(B) since plaintiffs had conceded at oral argument that they could not establish the specific intent required by section 1140. (*See id.* at p. 2.) As for the merits of the recharacterized claim, the Court observed at the outset that "[i]t is not disputed that plaintiffs would have qualified for benefits under RCAG's severance benefits plan had they been discharged twenty-four hours before they were." (*Id.* at p. 1.) The Court then summarized plaintiffs' theory as being that "they were employees of MCI for twenty-four hours and therefore qualified for, and were entitled to, MCI's severance benefits plan" while at the same time being entitled to RCAG benefits "*in addition* to the MCI severance benefits because they were discharged by RCAG prior to their employment by MCI." (*Id.* at pp. 1–2) (emphasis in original.) According to the panel, plaintiffs "argue that the purported transfer from one entity to the other was a sham." (*Id.* at p. 2.) In disposing of this claim the Court stated:

> The defect in plaintiffs' argument is the absence of a triggering event.
>
> Plaintiffs were entitled to severance benefits under the MCI severance benefits plan. They have been paid in full.

(*Id.* at p. 2.)

Based on this holding by the Ninth Circuit, defendants now assert in this case that the *Algie* plaintiffs should be barred or estopped from asserting their three ERISA denial-of-benefits claims. In pressing for such an outcome, defendants' arguments appear to shift somewhat from brief to brief. Principally they argue that the *Algie* plaintiffs were, in effect, represented by the plaintiffs in *Pippin* or that they were involved in the *Pippin* litigation in that they and their counsel here knew of it and deliberately chose not to intervene in California, deciding instead to "sit on the fence" and thereby gain a tactical advantage. Alternatively, defendants appear to argue that it is unfair that plaintiffs here, who are said to be identically situated to the *Pippin* plaintiffs, should be permitted to relitigate what defendants contend are the very claims already disposed of in defendants' favor in the Ninth Circuit.

Whether denominated as a form of claim preclusion (commonly referred to as res judicata) or a form of issue preclusion (known as collateral estoppel), defendants' theories cannot survive scrutiny. Notwithstanding defendants' suggestions to the contrary, there is no evidence to suggest that any of the plaintiffs participated in, controlled or agreed to be bound by the *Pippin* litigation, and defendants offer no other basis for treating that lawsuit as preclusive here.

■ The *Restatement (Second) of Judgments* defines the principle of *res judicata,* or claim preclusion, insofar as pertinent to this case, as follows:

> A valid and final personal judgment rendered in favor of the defendant bars another action by *the plaintiff* on the same claim.

ALI *Restatement (Second) of Judgments* § 19 (emphasis added). The effect of such a bar is to preclude the assertion in later proceedings of all matters that either were or could have been raised in the first proceeding. *See, e.g.,* 1B J. Moore, *et al., Moore's Federal Practice* ¶¶ 0.405[1] at 178–79, 0.405[3] at 190–93 (2d ed. 1993); *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981); *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); *Saud v. Bank of New York,* 929 F.2d 916, 918 (2d Cir.1991); *Fay v. South Colonie Cent. School Dist.,* 802 F.2d 21, 28 (2d Cir.1986).

■ The related principle of collateral estoppel, or issue preclusion, is summarized by the *Restatement* as follows:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between *the parties,* whether on the same or a different claim.

*Restatement (Second) of Judgments* § 27 (emphasis added). *See generally* 1B *Moore's Federal Practice, supra,* ¶ 0.441[2] at 722–31. This principle will preclude relitigation only of those matters "which were in issue or controverted and upon the determination of which the initial judgment necessarily de-

pended." 1B *Moore's Federal Practice, supra,* ¶ 0.441[2] at 725. *See, e.g., Brown v. Felsen,* 442 U.S. at 139 n. 10, 99 S.Ct. at 2213 n. 10; *In re PCH Assocs.,* 949 F.2d 585, 593 (2d Cir.1991); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 (2d Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992).

■ As is evident from the accepted formulation of these rules, a party cannot be bound by a prior adjudication unless he can be said to have participated in the earlier proceeding. *See, e.g., Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 10 n. 5, 110 S.Ct. 2695, 2701 n. 5, 111 L.Ed.2d 1 (1990); *Martin v. Wilks,* 490 U.S. 755, 761, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989); *Stone v. Williams,* 970 F.2d 1043, 1060 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *United States v. Schwimmer,* 968 F.2d 1570, 1577 (2d Cir. 1992); *United States v. International Bhd. of Teamsters,* 964 F.2d 180, 183 (2d Cir.1992). As noted in *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940):

> It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he had not been made a party by service of process.

Indeed, this requirement has, in part, a constitutional basis since the Due Process Clause guarantees at least notice and an opportunity to be heard as a party. *See, e.g., Haring v. Prosise,* 462 U.S. 306, 313, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983); *Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 480–81 & n. 22, 102 S.Ct. 1883, 1896–97 & n. 22, 72 L.Ed.2d 262, *reh. denied,* 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); *Conte v. Justice,* 996 F.2d 1398, 1401 (2d Cir.1993); *Stone v. Williams,* 970 F.2d at 1056, 1060. *See generally Martin v. Wilks,* 490 U.S. at 762 & n. 2, 109 S.Ct. at 2184 & n. 2 (due process satisfied by notice and opportunity to intervene, but federal rules limit

preclusion to those served, not those with notice).

■ In elaborating on this general point, the courts have recognized that in defined circumstances someone other than a "designated ... party" or a "served" party may be bound by a prior judgment or adjudication, but those circumstances are quite narrowly defined. As summarized by Professor Moore, those holdings of estoppel or bar based on a finding of privity to a litigant generally involve "concurrent relationships to the same property right; successive relationships to the same property or right; or representation of the interests of the same person." 1B *Moore's Federal Practice, supra,* ¶ 0.411[1] at III–215. *See, e.g., Staten Island Rapid Trans. Operating Auth. v. ICC,* 718 F.2d 533, 542 (2d Cir.1983); *Connell v. Weiss,* 1988 WL 78364 at *2–3 (S.D.N.Y. July 21, 1988); *Horger v. New York University Medical Center,* 642 F.Supp. 976, 979 (S.D.N.Y.1986); *Clark v. International Bhd. of Teamsters,* 598 F.Supp. 365, 367 (S.D.N.Y. 1984). *See generally* 1B *Moore's Federal Practice, supra,* ¶ 0.411[1] at III–211, 215–18; *Restatement (Second) of Judgments* §§ 36, 39–46, 48, 51–52. The first two of these categories plainly have no application here,[7] and the remaining category—representation of the plaintiff's interests by a prior litigant—has not been shown to apply either.

■ The adequacy of a prior party's representation of a later party's interests takes one of two distinct forms. First, if the current party in effect participated in the prior litigation by exerting sufficient "control" of it, he may be bound by its outcome. Second, in some narrowly defined circumstances the courts have recognized that a litigant in the first lawsuit may have given "virtual representation" to the later litigant, and in such a case the represented party may be bound. I examine each of these principles separately.

As defined by the *Restatement,*

A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party.

*Restatement (Second) of Judgments* § 39. The quintessential example of such control is found in *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), in which the Supreme Court held the Government bound by a prior adjudication to which it was not a party, because the United States had

(1) required the [prior] lawsuit to be filed;

(2) reviewed and approved the complaint;

(3) paid the attorneys' fees and costs;

(4) directed the appeal from the State District Court to the Montana Supreme Court;

(5) appeared and submitted a brief in the Montana Supreme Court;

(6) directed the filing of a notice of appeal to this Court; and

(7) effectuated [plaintiff's] abandonment of that appeal on advice of the Solicitor General.

*Id.* at 155, 99 S.Ct. at 974.

■ Admittedly, the facts in *Montana* exceeded the minimum showing necessary to establish a non-party's control of a lawsuit. Nonetheless, a purported controlling nonparty must, at least, be able to decide what legal theories and evidence should be advanced in the first action and whether an appeal should be taken from an adverse decision. *See, e.g., Restatement (Second) of Judgments* § 39, Comment c; 1B *Moore's Federal Practice, supra,* ¶ 0.411[6] at III–258 to 260; *United States v. Davis,* 906 F.2d 829, 833 (2d Cir.1990); *Virginia Hosp. Ass'n v. Baliles,* 830 F.2d 1308, 1313 (4th Cir.1987), *cert. granted in part,* 493 U.S. 808, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989), *aff'd,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *United States v. Bonilla Romero,* 836 F.2d 39, 43 (1st Cir.1987), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988);

---

**7.** These involve such matters as the effect of a judgment against an obligee on an obligor (*Restatement* at § 53), the effect of an adjudication concerning interests in property on successors to the property (*id.* at § 43), the effect of a judgment against a corporation on its officers and shareholders (*id.* at § 59), the effect of a judgment against a partner on the partnership (*id.* at § 60), and the effect of a judgment against an indemnitee on an indemnitor. (*Id.* at 57, 58.)

*Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir.1987); *Hastings v. Judicial Conference of the United States*, 829 F.2d 91, 100 & n. 40 (D.C.Cir. 1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); 18 C. Wright & A. Miller, *Federal Practice & Procedure* 4451 at 432–33 (1981). *See also Nat'l Fuel Gas Distrib. Corp. v. TGX Corp.*, 950 F.2d 829, 839 (2d Cir.1991) (applying New York law) (participation as amicus insufficient to demonstrate control).

■ In this case, there is no evidence that the *Algie* plaintiffs controlled the *Pippin* litigation in any respect. Indeed, it appears that neither plaintiffs nor their counsel were even aware of the *Pippin* lawsuit until virtually the termination of proceedings in the District Court in California. Necessarily, then, there is no evidence that the *Algie* plaintiffs had any role in selecting the legal theories or shaping the factual presentation in *Pippin* ; indeed, the precise theories presented here, except for Count IV—which is no longer being pressed—differ significantly from what was argued in *Pippin*, and Count IV was added to this lawsuit only in the wake of the decision by the *Pippin* district court upholding that precise theory. Similarly, there is no evidence that the *Algie* plaintiffs or their counsel had any input whatsoever into how the *Pippin* plaintiffs handled the appeal to the Ninth Circuit. *Compare, e.g., Ruiz v. Commissioner of Dep't of Transp.*, 858 F.2d 898, 903–04 (2d Cir.1988) (plaintiffs controlled separate state-court litigation through their attorney).[8]

The principal alternative theory on which defendants appear to rest their estoppel or bar claim is the notion that, by virtue of their comparable legal interests vis-a-vis RCAG

and MCI, the *Pippin* plaintiffs in effect represented the interests of the *Algie* plaintiffs, who must therefore be deemed bound by the prior adjudication. Again, defendants' argument is well wide of the mark.

The core of the representational theory of preclusion is summarized by the *Restatement* as follows:

(1) a person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

(a) The trustee of an estate or interest of which the person is a beneficiary; or

(b) Invested by the person with authority to represent him in an action; or

(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

(d) An official or agency invested by law with authority to represent the person's interests; or

(e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

*Restatement (Second) of Judgments* § 41(1). In any of these specified circumstances, the represented person "is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process." *Id.* § 41(2).[9]

■ As the terms of section 41 indicate, virtual representation requires either some form of agreement by the non-party to per-

---

**8.** The only basis on which defendants appear at times to suggest control is their apparently inaccurate claim that plaintiffs in both cases were represented by the same attorney. It appears, however, that the only relationship was that for a brief period of time before either lawsuit was filed, an attorney at the Lankenau, Kovner firm represented a group of former RCAG employees in communicating with RCAG and MCI concerning severance plan questions, and that one member of the group later participated in the *Pippin* suit as a plaintiff. (*See* Reply Affirmation of Wayne N. Outten, Esq., executed April 26, 1993, at ¶¶ 3–6; Dep. of Joseph Tarantino at 108–12.)

This minor linkage is obviously not tantamount to control by the *Algie* plaintiffs of the *Pippin* litigation. *Cf. Conte v. Justice*, 996 F.2d at 1402–03; *Ruiz v. Commissioner of Dep't of Transp.*, 858 F.2d at 903–04; *Scheiner v. Wallace*, 832 F.Supp. 687, 699 (S.D.N.Y.1993).

**9.** Section 43 of the *Restatement* contains certain exceptions to the general rule of representation. Since the general rule of Section 41 does not apply here, we need not explore the potential applicability of these exceptions.

mit the litigant in the first suit to represent him (see also Restatement § 41, Comment a), or else a relationship between them that demonstrates that the litigant was authorized to represent and was in fact representing the legal interest of the non-party. "For a non-party to be so 'closely aligned ... requires more than a showing of parallel interest or, even, a use of the same attorney in both suits.'" Benson & Ford, Inc. v. Wanda Petroleum Co., 833 F.2d at 1175 (quoting Freeman v. Lester Coggins Trucking, Inc., 771 F.2d 860, 864 (5th Cir.1985)). See also Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 265 (1st Cir.1993) (citing cases); Allen v. Men's World Outlet Inc., 679 F.Supp. 360, 363–64 (S.D.N.Y.1988) (quoting Staten Island Rapid Trans. Operating Auth. v. ICC, 718 F.2d at 542). Accord, Connell v. Weiss, 1988 WL 78364 at *2.

■ It is evident that the principle of virtual representation cannot be applied in the current case. There is no evidence that the Algie plaintiffs authorized the Pippin plaintiffs to represent their legal interests. Moreover, the relationship between the two sets of plaintiffs was not one that would have endowed the Pippin plaintiffs with such authority. All were former RCAG employees who had been terminated in circumstances that led them to believe that they had been denied benefits owed them under the RCAG severance benefits plan. As such, the Pippin plaintiffs had legal interests parallel to those of the Algie plaintiffs, but this alone cannot create a basis for claim or issue preclusion. See, e.g., Staten Island Rapid Trans. Operating Auth. v. ICC, 718 F.2d at 542–43; Leonhard v. United States, 633 F.2d 599, 616 (2d Cir.1980), cert. denied, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981) (unsuccessful challenge by father to his forced separation from his children does not estop children's claim for same misconduct). Accord, e.g., Montalvo–Huertas v. Rivera–Cruz, 885 F.2d 971, 975–76 (1st Cir.1989); Freeman v. Lester Coggins Trucking, Inc., 771 F.2d at 862–65 (citing cases); Connell v. Weiss, 1988 WL 78364 at *2; Allen v. Men's World Outlet Inc., 679 F.Supp. at 363–64; Green v. Santa Fe Indust., Inc., 70 N.Y.2d 244, 252–54, 519 N.Y.S.2d 793, 796, 514 N.E.2d 105, 107–09 (1987) (suit by shareholders not barred by prior suit by other shareholders). As one circuit court has noted: "[P]rivity is not established by the mere fact that persons may happen to be interested in the same question or in proving the same state of facts." Hardy v. Johns–Manville Sales Corp., 681 F.2d 334, 340 (5th Cir.1982) (quoting Benson v. Wanda Petroleum Corp., 468 S.W.2d 361, 363 (Tex.1971)).

In seeking to avoid this conclusion, defendants rely principally on the decision of the Second Circuit in Amalgamated Sugar Co. v. NL Industries, Inc., 825 F.2d 634 (2d Cir.), cert. denied sub nom. Rothenberg v. Amalgamated Sugar Co., 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987), which they appear to read as authorizing application of claim or issue preclusion whenever the first litigant has the same type of factual and legal interests as the non-party. It plainly does not.

At issue in Amalgamated Sugar was whether shareholders in a corporation were barred by a prior settlement by the corporation itself with respect to the same claim. Noting that the corporate directors, in settling the prior suit, were acting as fiduciaries for the shareholders, the court simply invoked the well-recognized principle "that collateral estoppel can be applied to nonparties where the litigating party acted in a fiduciary capacity in protecting the nonparties' interests." Id. at 641 (citing Sea–Land Services, Inc. v. Gaudet, 414 U.S. 573, 593, 94 S.Ct. 806, 819, 39 L.Ed.2d 9, reh. denied, 415 U.S. 986, 94 S.Ct. 1582, 39 L.Ed.2d 883 (1974)). As a fiduciary, the litigant in the first case is of course charged with loyally representing the specific legal interests of the beneficiary; hence, in such a circumstance the court may properly invoke the theory of virtual representation, at least when satisfied that the fiduciary did in fact fulfill his duties. See, e.g., id. at 641. See generally Restatement (Second) of Judgments §§ 41(1)(a), (c). That is not the case here, however, since the Pippin plaintiffs bore no obligation to represent the legal interests of the Algie plaintiffs.

Similarly inapplicable are the Second Circuit's decisions in Ellentuck v. Klein, 570 F.2d 414 (2d Cir.1978), and Expert Elec., Inc.

*v. Levine,* 554 F.2d 1227 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977), both of which are invoked by defendants. In each, an association had first filed and lost a lawsuit, and the court then held that a subsequent suit on the same claim by members of the association was barred since

> generally speaking, one whose interests were adequately represented by another *vested with the authority* is bound by [a prior] judgment although not formally a party to the litigation.

*Ellentuck v. Klein,* 570 F.2d at 425–26 (quoting *Expert Elect., Inc. v. Levine,* 554 F.2d at 1233 (emphasis added)). In each case the plaintiff association had evidently been authorized to bring suit on behalf of its members, and did in fact do so. Thus the members were barred from bringing a second suit. *See also Amalgamated Sugar Co. v.*

NL Industries, Inc., 825 F.2d at 640–41 (applying *Ellentuck* and *Expert Electric* ).[10]

As a back-up argument, defendants press the notion that failure to bind the *Algie* plaintiffs would be inequitable. In substance they insist that plaintiffs could have joined the *Pippin* suit, and that in any event they should be bound since, if *Pippin* had been decided in favor of the plaintiffs in that case, defendants would have been bound here. They also seem to criticize plaintiffs for seeking to reap the benefits of *Pippin* by amending their complaint to add the claim on which the plaintiffs in *Pippin* prevailed at the district court level. None of these arguments has merit.

The *Algie* plaintiffs had no duty to intervene in *Pippin. See, e.g., Martin v. Wilks,* 490 U.S. at 763, 765, 109 S.Ct. at 2185, 2186; *United States v. Schwimmer,* 968 F.2d at 1577–78; *Staten Island Rapid Trans. Operating Auth. v. ICC,* 718 F.2d at 543; *Benson*

10. Defendants cite a handful of other decisions, but none justifies the result for which they press. In *National Wildlife Fed'n v. Gorsuch,* 744 F.2d 963 (3d Cir.1984), the court found the plaintiffs precluded by virtue of two prior adjudications that they had closely monitored, and in one of which they had unsuccessfully sought to intervene. The court held that their failure to seek intervention in one of the suits and their failure to appeal the denial of intervention in the other justified precluding a litigation that sought to modify the consent decree entered in one of the suits. *Id.* at 969–71. That decision, in which the court emphasized the narrowness of its holding, is of no weight here for two substantial reasons. First, the *Algie* plaintiffs never knew of the *Pippin* case until nearly its termination, much less closely monitored it, and thus never had a realistic opportunity to intervene. Second, the holding by the Third Circuit precluding collateral attacks on a consent decree has effectively been overruled by the Supreme Court in *Martin v. Wilks,* 490 U.S. at 764–68, 109 S.Ct. at 2185–88. As the Court noted in *Martin:* "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree." *Id.* at 765, 109 S.Ct. at 2186. *Accord, Frederick County Fruit Growers Ass'n, Inc. v. Martin,* 968 F.2d 1265, 1269 (D.C.Cir.1992). *See also United States v. Schwimmer,* 968 F.2d at 1577–78. *Compare Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d at 266 n. 15 (noting narrow exceptions to "no-duty-to-intervene" rule).

Of the other cases cited by defendants, all are distinguishable. One involves a prior suit brought as a class action. *See Bronson v. Board of Educ.,* 525 F.2d 344, 349 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1655, 48 L.Ed.2d 175 (1976). Another, *Lynch v. Merrell–National Lab.,* 646 F.Supp. 856, 860 (D.Mass.1986), *aff'd mem.,* 830 F.2d 1190 (1st Cir.1989), involved plaintiffs in a mass product liability suit who had participated in multi-district discovery and then chosen without explanation to opt out of the trial on liability and were held to be bound by its result. Plaintiffs in this case had no such opportunity. Still another cited case, *Petit v. City of Chicago,* 766 F.Supp. 607, 611–12 (N.D.Ill.1991), held that plaintiff white police officers who sought to challenge a police test as discriminatory were bound by a prior adjudication involving the same claim. Some of the plaintiffs had intervened in the prior suit and were thus bound as participants, whereas others had not intervened but were held to have been "adequately" represented by the intervenors. In reaching this conclusion, however, the court acknowledged that identity of interests alone is insufficient, *id.* at 612 (citing *Mann v. City of Albany,* 883 F.2d 999, 1003 (11th Cir.1989)), and found an estoppel only because it concluded that the prior intervenors were seeking to avoid the effect of the prior judgment on the merits by adding new parties and refiling the suit. *Id.* at 613. No such tactical maneuvering is evident here. *See also Casa Marie Inc. v. Superior Ct. of Puerto Rico,* 988 F.2d at 266; *see generally Restatement (Second) of Judgments* § 62(2) (nonparty may be barred from relitigation of claim if, by his actions, he induced the justifiable expectation that he would "govern his conduct by the judgment in the original action").

& Ford, Inc. v. Wanda Petroleum Co., 833 F.2d at 1176; Petit v. City of Chicago, 766 F.Supp. at 612; 18 C. Wright & A. Miller, Federal Practice & Procedure § 4452 at 446 (1981). As noted by the Supreme Court,

[t]he law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger.... Unless duly summoned to appear in a legal proceeding, a person not in privy may rest assured that a judgment recovered therein will not affect his legal rights.

Martin v. Wilks, 490 U.S. at 763, 109 S.Ct. at 2185 (quoting Chase Nat'l Bank v. City of Norwalk, 291 U.S. 431, 441, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934)). Accord, Stone v. Williams, 970 F.2d at 1060; Staten Island Rapid Trans. Operating Auth. v. ICC, 718 F.2d at 543. Hence plaintiffs could not be bound even by a knowing failure to intervene in Pippin. In any event, for reasons noted, they never had a meaningful opportunity to do so absent timely knowledge of the Pippin lawsuit.[11]

As for the purported unfairness of allowing plaintiffs to avoid being bound by Pippin even though defendants would have been bound by an adverse decision, defendants' argument appears in substance to quarrel with the holding of the Supreme Court in Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979), which upheld the non-mutual availability of collateral estoppel in limited circumstances. See also ACLI Gov't Sec., Inc. v. Rhoades, 963 F.2d 530, 533 (2d Cir.1992); United States v. International Bhd. of Teamsters, 905 F.2d 610, 621 (2d Cir.1990). In any event, defendants do not demonstrate any evident unfairness.

The Algie plaintiffs have a due process right to litigate all issues once, and if they did not participate or were not represented in Pippin, they must be permitted to be heard here. Defendants have the same right to be heard once on an issue and were given the opportunity to litigate the issues in Pippin. Hence, collateral estoppel here in favor

of plaintiffs on any issues that defendants might have lost in Pippin would not be inconsistent with giving the Algie plaintiffs their own opportunity to litigate issues or claims lost by the Pippin plaintiffs. See, e.g., Parklane Hosiery Co. v. Shore, 439 U.S. at 330–31, 99 S.Ct. at 651–52; ACLI Gov't Sec., Inc. v. Rhoades, 963 F.2d at 533; United States v. International Bhd. of Teamsters, 905 F.2d at 621.

Moreover, the purported unfairness about which defendants complain arises only in cases in which a party seeks to make offensive use of collateral estoppel. It is for this reason that the Court in Parklane left the use of offensive issue preclusion to the "broad discretion" of the trial court. 439 U.S. at 330, 99 S.Ct. at 651. See United States v. International Bhd. of Teamsters, 905 F.2d at 621; Pompano–Windy City Partners, Ltd. v. Bear, Stearns & Co., 1993 WL 42786 at *8 (S.D.N.Y. Feb. 17, 1993) (listing factors court should consider before allowing the offensive use of collateral estoppel); Restatement (Second) of Judgments § 29. See generally Jack Faucett Assocs. v. AT & T Co., 744 F.2d 118, 124–25 (D.C.Cir. 1984), cert. denied, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985).

The potential unfairness in lack of mutuality is illustrated by the example cited in Parklane, which involved the use of offensive issue preclusion based on one of several inconsistent judgments. See Parklane Hosiery Co. v. Shore, 439 U.S. at 330, 99 S.Ct. at 651. The illustration was provided by Professor Currie, who hypothesized a train collision injuring fifty passengers, all of whom sued the railroad. If the first twenty-five plaintiffs lost, but the twenty-sixth won, Professor Currie argued that the remaining passengers should not be allowed to use that one adverse judgment to preclude the railroad from defending against their subsequent suits. See id. at 330 n. 14, 99 S.Ct. at 651 n. 14 (citing Currie, Mutuality of Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.Rev. 281, 304 (1957)). Accord, Hoppe v. G.D. Searle & Co., 779 F.Supp. 1425, 1427 (S.D.N.Y.1991).

---

11. It is in any event questionable whether a party with presumably limited resources should be expected to litigate his claims three thousand miles away from home when he can obtain jurisdiction over the defendant in or near his home district.

That circumstance is of course not at all present here. It is defendants that seek to invoke issue or claim preclusion and to do so despite the fact that plaintiffs have had no opportunity to litigate their claims. This they may not do.[12]

Finally, plaintiffs' effort to take advantage of the temporary success of the *Pippin* plaintiffs on their section 1140 claim says nothing except that plaintiffs' attorneys in this case were doing their job. If plaintiffs were entitled to offensive issue preclusion, they could not be faulted for claiming the fruits of the *Pippin* plaintiffs' success. In any event, there is no hint in this case of the deliberate, arguably bad-faith effort of the plaintiffs in *Petit v. City of Chicago* to evade the effect of a prior loss on the merits. *See* 766 F.Supp. at 612. *See also Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d at 266.

## B. *The Merits of the Parties' Summary Judgment Motions*

As noted, defendants have moved for summary judgment on all four claims and plaintiffs seek similar relief on their first three claims. Before addressing their arguments, I briefly summarize the applicable standards.

### 1. *General Standards for Summary Judgment*

■ Rule 56(c) of the Federal Rules of Civil Procedures permits the court to enter summary judgment only if it finds that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See, e.g., Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993); *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir.1993); *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). It is axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party." *Miner v. City of Glens Falls*, 999 F.2d at 661 (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 11). *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Village of Kiryas Joel Local Dev. Corp. v. Insurance Co. of North America*, 996 F.2d 1390, 1392 (2d Cir.1993); *Hudson Hotels Corp. v. Choice Hotels, Int'l*, 995 F.2d 1173, 1175 (2d Cir.1993); *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990).

■ The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See, e.g., Capital Imaging Assocs. P.C. v. Mohawk Valley Medical Assocs. Inc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). If the movant fails to meet its burden, the motion must be denied even if the opponent fails to submit any evidentiary matter to establish a genuine issue for trial. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Kulawy v. United States*, 917 F.2d 729, 735 (2d Cir.1990); *Proctor & Gamble Co. v. Big Apple Indus. Bldgs. Inc.*, 1993 WL 228846, at *7 (S.D.N.Y. June 18, 1993).

■ If the movant carries its initial burden, the party opposing the motion must then show that there is in fact a genuine dispute as to one or more of the material facts. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d at 542; *Weg v. Macchiarola*, 995 F.2d at 18; *Greater Buffalo Press, Inc. v. Federal Reserve Bank*, 866 F.2d 38, 42 (2d Cir.), *cert. denied*, 490 U.S.

---

**12.** In view of this conclusion, we need not consider whether there would be sufficient identity of issues and/or claims to permit defendants to satisfy the remaining elements of either issue or claim preclusion.

1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). In so doing, the opposing party cannot simply rely on his pleadings or on conclusory allegations or conjecture as to the facts, but rather must present specific evidence in support of his contention that there is a genuine factual dispute. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511; *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d at 542; *Leon v. Murphy,* 988 F.2d at 308.

■■■ To demonstrate that there is a "genuine dispute," the party opposing the summary judgment motion must come forward with enough evidence to justify a reasonable jury returning a verdict in his favor. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Hudson Hotels Corp. v. Choice Hotels, Int'l,* 995 F.2d at 1175; *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993); *Glazer v. Formica Co.,* 964 F.2d 149, 154 (2d Cir.1992); *Aldrich v. Randolph Cent. School Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). Thus, the party opposing summary judgment cannot meet his burden on the motion by adducing evidence that is "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. *See, e.g., Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 865 F.2d 492, 493 (2d Cir.1989) (*per curiam*); *Siderpali, S.P.A. v. Judal Indus., Inc.,* 833 F.Supp. 1023, 1031 (S.D.N.Y.1993); *Reyes v. Koehler,* 815 F.Supp. 109, 112 (S.D.N.Y.1993); *Carnegie v. Miller,* 811 F.Supp. 907, 910–11 (S.D.N.Y.1993) (citing cases). In effect, the court must apply the same standard as it would utilize under Fed. R.Civ.P. 50(a) in deciding a motion for a directed verdict at trial, and therefore must enter summary judgment if there can be only one reasonable conclusion based on the evidence adduced. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511 (citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943)). *See, e.g., Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989); *United States v. United Bhd. of Carpenters,* 1993 WL 159959 at *4 (S.D.N.Y. May 12, 1993).

### 2. *Plaintiffs' Section 1140 Claim (Count IV)*

■■■ Plaintiffs' fourth claim mirrors the theory on which the plaintiffs in *Pippin* prevailed in the District Court in California. It is premised on the notion that the two defendants orchestrated the timing of plaintiffs' termination with a view to denying plaintiffs their entitlement to severance benefits under the RCAG plan. Faced with defendants' summary judgment motion, plaintiffs now concede that they lack evidence of the requisite intent on the part of defendants. (*See* Pltffs' Memo.Opp. at pp. 2–3.) Since such a showing of intent is required under 29 U.S.C. § 1140, *see, e.g., Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir. 1988) (citing cases); *Weingord v. Western Union World Comm. Inc.,* 1991 WL 90742 at *6 (S.D.N.Y. May 23, 1991); *accord, Custer v. Pan American Life Ins. Co.,* 12 F.3d 410, 422 (4th Cir.1993), defendants' motion, insofar as addressed to the fourth claim, is granted.

### 3. *Plaintiffs' Claim for Denial of Benefits (Count I)*

Plaintiffs' principal claim is that, irrespective of intent, they were entitled to be paid severance benefits under the terms of the RCAG severance plan rather than at the lower levels specified in the MCIC plan, and they seek an award representing the difference between the two benefit levels.[13] Unlike the *Pippin* plaintiffs, they do not seek, in effect, a double payment of benefits, that is, an award of the full amount of RCAG benefits in addition to the moneys already paid under the MCIC plan.

---

**13.** The total amount of benefits that the twenty-three plaintiffs would be entitled to if they prevailed under this theory is $399,897.00. (*See* Third Amended Complaint at p. 13.)

In pressing this claim, plaintiffs appear to follow two alternative routes to reach the same destination. First, they argue that the RCAG plan was not terminated at or immediately after the closing and that they remained RCAG employees after the closing, until they were terminated, thus triggering their rights under the still-extant RCAG plan. Second, they appear to argue that if, as of the time of closing, they ceased to be RCAG employees and became instead MCII employees, they were effectively "laid off" by RCAG within the meaning of its severance plan, which was still in effect. Under this theory they immediately became entitled to RCAG plan benefits since the new employer did not offer them a comparable job, as evidenced by their prompt termination by MCII, and hence they do not come within any exception to coverage by the RCAG plan.

In resisting the first of these arguments, defendants argue, in substance, that the RCAG plan terminated as of the closing and that in any event plaintiffs became MCII employees and therefore, when terminated shortly thereafter, were covered solely by the MCI plan. As for the plaintiffs' alternative analysis, defendants appear to take the position, once again, that the RCAG plan was terminated at the time of closing, and that in any case plaintiffs were not terminated by RCAG as of the closing but rather became MCII employees.

### (a) *Plaintiffs' First Theory*

Plaintiffs' initial theory—that the RCAG plan remained in effect after the closing and that plaintiffs remained RCAG employees until terminated—raises two central factual issues. First, was the RCAG plan terminated prior to plaintiffs' discharge pursuant to the notice supplied by MCII? Second, if not, were the plaintiffs employed by RCAG or MCII when they were terminated? I first address the plan termination question.

### (i) *Did RCAG Terminate Its Severance Plan?*

■ We start with the premise that an employer who establishes an employee welfare benefit plan, such as the RCAG severance benefit plan, *e.g., James v. Fleet/Norstar Fin. Group*, 992 F.2d 463, 465 (2d Cir.

1993), is not prohibited by ERISA from amending or terminating the plan at any time. *See, e.g., Reichelt v. Emhart Corp.*, 921 F.2d 425, 430 (2d Cir.1990), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991). This follows from the fact that, unlike an employee pension plan, a welfare benefit plan does not, by itself, create any vested rights in the employee. *See, e.g., id.*, at 430. Nonetheless, ERISA does impose certain limitations on whether and by what means the employer may effectuate such an amendment or termination.

Section 402 of ERISA, 29 U.S.C. § 1102(a)(1), provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." It further requires that the plan must specify "a procedure for amending such plan and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). *See, e.g., Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988). Since the term "employee benefit plan" is defined to cover both welfare benefit and pension benefit plans, *see* 29 U.S.C. § 1002(3); *Shaw v. Delta Air Lines Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983); *James v. Fleet/Norstar Fin. Group Inc.*, 992 F.2d at 465, these requirements apply to an employer's severance benefits plan. *See* 29 U.S.C. § 1003(a); *Reichelt v. Emhart Co.*, 921 F.2d at 430 (citing cases).

■ From this statutory language it follows that the plan must indicate who is authorized to modify or terminate it, under what circumstances and by what procedure, and the sponsor must comply with the terms of the plan in these respects. "By explicitly requiring a plan to specify its amendment procedure, Congress rejected the use of informal written documents." *Sigmund Cohn Corp. v. Machinists Pension Fund*, 804 F.Supp. 490, 494 (E.D.N.Y.1992) (citing *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986)). *See also Moore v. Metropolitan Life Ins. Co.*, 856 F.2d at 492; *Siskind v. Sperry Retirement Program*, 795 F.Supp. 614, 617 (S.D.N.Y.1992) (the designation of an amendment procedure is not a mere formality). A failure either of advance specification or of compliance with these specifica-

tions can be fatal to an effort to modify or terminate.

Thus, for example, in a recent decision the Third Circuit upheld a district court ruling that the employer's termination of health insurance benefits for a portion of the plan's participants violated section 402(b)(3) of ERISA because the plan included no provision specifying who was authorized to modify or terminate the plan and the procedures for modification or termination. *See Schoonejongen v. Curtiss–Wright Corp.,* 18 F.3d 1034, 1038–40 (3d Cir.1994).[14] In so holding, the Court noted that the plan documents stated that "[t]he company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all provisions." Nonetheless, the Court held that "[a] simple reservation of a right to amend is not the same as a 'procedure for amending [the] plan'; nor does it provide a procedure 'identifying the persons who have authority to amend the plan.'" *Schoonejongen v. Curtiss–Wright Co.,* 18 F.3d at 1039–40.

The Court in *Schoonejongen* concluded that since changes in a plan must be undertaken in conformity with the procedures specified in the plan, the sponsor could not alter the plan in the absence of the plan specifications required by section 402(b)(3). *Id.* at 1039 & n. 4. In explaining this conclusion the Court observed:

> The basic premise of ERISA is that a plan sponsor will be free to determine what benefits the plan will provide, but that once such a determination has been made, the benefits must be described in a written plan that is available to participants at any time upon request. Thereafter the participants are entitled to rely upon the plan document as defining the benefits currently being provided. Unless and until the written plan is altered in a manner, and by a person or persons, authorized in the

plan, neither the plan administrator nor a court is free to deviate from the terms of the original plan. It is in this way that ERISA provides certainty and protects participants against frustration of their legitimate expectations.

*Id.* at 1039–40. Accordingly, the Court held that the sponsor could not substantively alter the plan provisions benefitting plan participants until it had first modified the plan documents to comply with section 402(b)(3) by identifying who within the corporation was empowered to alter the plan and the procedures for undertaking such an alteration. *Id.* But see *Adams v. Avondale Indust. Inc.,* 905 F.2d 943, 949 (6th Cir.) (plan without procedures can be amended unless participant is prejudiced), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

The logic of this analysis is compelling. The employer is required by ERISA to have a written plan and to specify a procedure for its modification in order "to ensure that 'every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.'" *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 77 (3d Cir.1991), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1479, 117 L.Ed.2d 622 (1992) (quoting *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1163–64 (3d Cir.1990)); H.Rep. No. 1280, 93rd Cong., 2d Sess. 297, *reprinted in* 1974 U.S.Cong. & Admin.News 4639, 5038, 5077–78. *Accord, Sigmund Cohn Co. v. Machinists Pension Fund,* 804 F.Supp. at 494; *Siskind v. Sperry Retirement Program,* 795 F.Supp. at 617. If an employer could modify a plan by any procedure in the absence of a specified plan procedure, it would in effect benefit by failing to comply with section 402(b)(3), a result that would sabotage the statutory scheme and the underlying policy of full notice to plan participants. *See, e.g., Schoonejongen v. Curtiss–Wright Corp.,* 18

**14.** The benefits at issue in *Schoonejongen* consisted of medical insurance, which was originally provided under the plan both to current employees and to retirees. These qualify as employee welfare benefits under ERISA. *See, e.g., Moore v. Metropolitan Life Ins. Co.,* 856 F.2d at 489 (citing 29 U.S.C. § 1002(1)); *Musto v. American General Corp.,* 861 F.2d 897, 901 n. 2 (6th Cir.1988)

(citing 29 U.S.C. §§ 1002(1)(A), (2)(A)), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Albert v. Avery Inc.,* 724 F.Supp. 245, 249 (S.D.N.Y.1989). *See also Shaw v. Delta Air Lines, Inc.,* 463 U.S. at 90 n. 5, 103 S.Ct. at 2896 n. 5; *McGann v. H & H Music Co.,* 946 F.2d 401, 407 (5th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992).

F.3d at 1039–40. *See also Siskind v. Sperry Retirement Program,* 795 F.Supp. at 617. Indeed, this concern underlies the consistent holdings of the courts that plan modifications must be in formal written form, and that oral changes will not be enforced absent fraud by the sponsor. *See, e.g., Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 10 (2d Cir.1992); *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d at 492; *Nachwalter v. Christie,* 805 F.2d at 960; *Ludwig v. NYNEX Service Co.,* 838 F.Supp. 769, 798 (S.D.N.Y.1993) (citing cases); *Sigmund Cohn Corp. v. Machinists Pension Fund,* 804 F.Supp. at 494.

A review of the documents governing the RCAG plan reflects virtually the same deficiency as in *Schoonejongen.* The RCAG "policy" reserves to the sponsor the authority to amend or terminate the plan at any time, but it fails to specify any procedure for such modification or termination or to identify who within the corporation has the authority to make the decision. It would seem to follow, then, that no substantive modification to the RCAG plan could be made by RCAG until the plan itself was amended to comply with section 403(b)(3). *See, e.g., Schoonejongen v. Curtiss–Wright Corp.,* 18 F.3d at 1040–41.

An argument could be made by defendants that the requirements of 29 U.S.C. § 402(b)(3) should be read as limited to modifications that change the terms of an ERISA plan but do not terminate it. *Cf. Schoonejongen v. Curtiss–Wright Corp.,* 18 F.3d at 1038–39 (noting, but rejecting, defendant's argument that its elimination of benefits for one category of participants constituted a termination of the prior plan and the institution of a new plan). This argument, although not squarely refuted by the language of section 402(b)(3)—which refers to the power to "amend" the plan—is open to question since it would ignore one acknowledged purpose of the provision, to ensure that participants are on notice of their rights, or lack of rights, under the then-effective plan. *See, e.g., Cefalu v. B.F. Goodrich & Co.,* 871 F.2d at 1296 (noting that writing requirement protects "[e]mployees who rely on a written benefit plan [from having] their benefits eroded by oral modifications to the benefit plan."). *Cf. Biggers v. Wittek Indust., Inc.,* 4 F.3d 291, 295–96 (4th Cir.1993) (utilizing common law of trusts to hold that amendment or termination of plan must be in writing that reflects clear intent to modify or terminate).[15] Moreover, such a distinction between amendment and termination would have the anomalous effect of requiring more elaborate notice if a participant's rights were reduced than if they were eliminated. *Cf. In re Vecchio,* 20 F.3d 555, 558 (2d Cir.1994).

■ In any event, we need not decide this question since defendants' assertion of plan termination must fail for a separate reason. Even if we assume that the RCAG severance plan contained sufficiently specific guidance on termination authority and procedures or that it was not required to have any, the record makes it plain, beyond triable dispute, that RCAG—the plan sponsor—never took the requisite steps to terminate the plan.

We start with the assumption that a reservation of authority by the sponsor to amend or terminate the plan could be read as authorizing such action by the Board of Directors of the sponsor. *See Schoonejongen v. Curtiss–Wright Co.,* 18 F.3d at 1039 n. 3 (noting concurring view of Judge Roth). That this was the assumption of the drafters of the RCAG plan is supported by the fact that when RCAG acted to terminate its participation in RCA-administered welfare plans, it did so through a resolution of its Board. (RCAG Consent of Directors, Defts' Exh. 3.)

The problem for defendants on this point, however, is that the Board of RCAG never acted to terminate the severance plan that RCAG administered. Indeed, the undisputed testimony of RCAG's Chief Executive Officer, Valerian Podmolik, establishes that up to the time of the closing, RCAG had taken no action to terminate the severance plan. (Podmolik Dep. at p. 118, lines 6–14) (Pltffs' Exh. 46). Mr. Podmolik left directly after the sale of RCAG stock to MCIC, but defendants proffer no evidence to demonstrate

---

**15.** ERISA contains an elaborate set of mandated procedures for plan termination, but this provision, found in Subchapter III, appears to be addressed solely to pension plans. *See* 29 U.S.C. §§ 1341–1341a.

that RCAG, through its Board of Directors or by any other means, subsequently acted to terminate the severance plan.

It bears noting that this lack of any action by the RCAG Board of Directors is in striking contrast to the actions taken by the RCAG Board as early as January 21, 1988, four months before the closing, when it formally resolved to terminate the participation by RCAG in a variety of specified welfare plans sponsored by RCA Corporation. (Defts' Exh. 7.) That action was plainly taken to comply with the requirement of paragraph 4.3(h)(i) of the Stock Purchase Agreement, which obligated GE to cause RCAG to terminate its participation in those specific plans. (Pltffs' Exh. 5 at p. 5.) The Agreement made no similar reference to the RCAG severance plan, and the record reflects that RCAG's Board took no comparable action with respect to the severance plan.

In sum, there appears to be no evidence to suggest that RCAG, as sponsor of the severance plan, ever took action to terminate the plan prior to or at the time of the closing. Similarly, there is no evidence that RCAG, which survived the closing as a corporate entity, took any such action after the sale of its stock, and certainly not within the period ending with the termination of the plaintiffs' employment.

In arguing to the contrary, defendants have taken a variety of positions. At one point, they appeared to argue that the January 21st resolution of RCAG's Board, either separately or in conjunction with the Stock Purchase Agreement, terminated the plan effective as of the closing. They appear to have receded from this position, and justifiably so since the Board resolution and the corresponding provisions of the Agreement, by their terms, are plainly limited to plans sponsored by RCA Corporation, and do not encompass RCAG-sponsored plans.

Alternatively, defendants have argued, albeit without much explanation, that the RCAG severance plan was effectively terminated by the closing itself. This argument fails in the absence of any evidence that RCAG, as the plan sponsor, took any corporate action to terminate the plan either before, during or after the closing.

Equally unavailing is the apparent suggestion by defendants that the plan was terminated as of the time of the actual stock purchase because representatives of MCIC had previously conveyed to RCAG's employees the fact that they would, after the merger, be covered by MCIC's various pension and welfare benefits plans. This argument fails for a number of reasons.

First, the authority to terminate the RCAG severance plan rested solely with its sponsor, RCAG, and, as noted, that entity took no action to terminate the plan. Indeed, as defendants take pains to emphasize, during the period between the signing of the Stock Purchase Agreement and the closing, MCIC had no authority over RCAG and thus plainly was in no position to govern its corporate affairs either directly or by ordering the Board of RCAG to take a corporate action such as termination of any plans.[16] Moreover, the record contains no evidence that MCIC ever sought to obtain such a termination decision from RCAG.

Second, whatever MCIC's representatives may have told plaintiffs and other RCAG employees at the December 1987 meetings in Piscataway, there is no evidence that they addressed the intended status of the RCAG plan for employees who were to be terminated immediately after the closing. Indeed, there is no indication that any RCAG employees were notified that layoffs would occur in the wake of the stock purchase, much less that the RCAG plan would not apply to them.

Further, even if such discussions had taken place at that time, and even if representations had been made by authorized representatives of RCAG itself, such oral communications would presumably be ineffective, by themselves, to alter or terminate the RCAG

---

**16.** If the Stock Purchase Agreement had provided for such termination—which, as noted, it did not—a failure to terminate would have given MCIC a contract-breach claim only against General Electric for failure to arrange for its subsid-

iary, RCAG, to take the necessary steps. Even in such a circumstance, MCIC could not claim that the plan had been terminated, but might have impleaded GE on a denial-of-benefits claim.

plan. As noted, section 402 of ERISA requires that all plans, including welfare benefit plans, be in writing. Based on this provision and the underlying policy that "participants in employee benefit plans should [not] be left to the uncertainties of oral communications in finding out precisely what rights they were given under their plans," *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d at 1169, the courts have consistently held that plan modifications adverse to the participants, including termination of benefits for participants, be in writing and issued under circumstances manifesting a clear intent to alter the plan. *See, e.g., Biggers v. Wittek*, 4 F.3d at 295–96; *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d at 492; *Ludwig v. NYNEX Service Co.*, 838 F.Supp. at 798 (citing cases); *Degrooth v. General Dynamics Co.*, 837 F.Supp. 485, 487 (D.Conn.1993); *Gonyea v. John Hancock Mut. Life Ins. Co.*, 812 F.Supp. 445, 448–49 (D.Vt.1993) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. at 97, 103 S.Ct. at 2900); *Adler v. Aztech Chas. P. Young Co.*, 807 F.Supp. 1068, 1071 (S.D.N.Y.1992). *See also Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir.1992); *Hamilton v. Air Jamaica*, 945 F.2d at 77; *Alday v. Container Corp. of America*, 906 F.2d 660, 665 n. 13 (11th Cir. 1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d at 1296.

In this case, then, even an oral statement by a representative of RCAG to the effect that the company intended to terminate the severance plan would not have sufficed to bring about its termination. In any event, there is no evidence of any attempt at plan termination, whether in written or in oral form.

### (ii) *Were Plaintiffs Employed By RCAG at the Time of Termination?*

There still remains the question of whether plaintiffs were employed by RCAG after the closing of the stock purchase. If not, as defendants contend, then they were not participants in the RCAG plan and hence not eligible for RCAG benefits based on the termination letter received within days after the closing.

Both the standards for assessing this type of question and the pertinent evidentiary record are somewhat murky. We start by noting that the transaction in question was a stock purchase by MCIC of the outstanding common shares of RCAG. Thus the net effect of the sale was not to dissolve the corporate existence of RCAG, but rather to transfer its ownership from GE to MCIC, which in turn assigned it as a subsidiary to one of its own subsidiaries. Had MCIC done nothing else, presumably the employees of RCAG would have remained in that status since there is a "presumption of separateness" between a parent and subsidiary. *See, e.g., Tri–Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 17 F.3d 38, 45 (2d Cir. 1994); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Crown Central Petroleum Corp. v. Cosmopolitan Shipping Co.*, 602 F.2d 474, 477 (2d Cir.1979); *Oriental Commercial & Shipping Co. v. Rosseel N.V.*, 702 F.Supp. 1005, 1018 (S.D.N.Y.1988); *Dolori Fabrics Inc. v. Limited Inc.*, 662 F.Supp. 1347, 1352 (S.D.N.Y.1987); *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 733 (S.D.N.Y.1986). As has been aptly noted, "when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer." *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir.1987); *Spence v. Maryland Casualty Co.*, 803 F.Supp. 649, 663 (W.D.N.Y.1992), *aff'd*, 995 F.2d 1147 (2d Cir.1993).

In this case, however, it is evident that MCIC intended to reassign most of the staff of RCAG to another of its subsidiaries, MCII, and it took specific actions to accomplish this. Most importantly, MCIC promptly arranged to integrate RCAG personnel into the pre-existing MCII workforce, with assignments of these individuals to MCII job slots, MCII work locations and MCII supervisors, together with specification of a salary consistent with MCII salary criteria. In addition, MCIC listed RCAG personnel on the MCII payroll, as reflected on its personnel database, and it enrolled those personnel in the MCIC pension and welfare benefit plans. We may assume, therefore, that shortly after the closing, those RCAG employees whom

MCIC had determined to retain were in fact performing services for MCII and being paid by it. Under all of the relevant circumstances, those individuals unquestionably had become MCII employees.

The more difficult question that we must face, however, concerns the status of RCAG employees who were not unambiguously hired by MCII through the offer of a specific job, assignment to the MCII workforce, performance of services for MCII and compensation for those services by MCII. The evidence on this point is thin, somewhat contradictory and occasionally ambiguous.

 To find that plaintiffs were employed by MCII, we must conclude that, by their conduct, they entered into an employment agreement with the corporation. Generally speaking, an employment agreement must cover four elements—specification of the parties involved, the position to be filled, the compensation to be paid and the period of employment. *See, e.g., Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 54, 110 N.E.2d 551, 553 (1953); *Gilinsky v. Sarbro Realty Corp.*, 138 A.D.2d 823, 824, 525 N.Y.S.2d 742, 743 (3rd Dep't 1988). *See also Ferrera v. Carpionato Corp.*, 895 F.2d 818, 822 (1st Cir.1990). The employment contract need not be written (except insofar as otherwise required by law), and its existence may be inferred from the conduct of the parties. *See, e.g., Schenk v. Red Sage Inc.*, 1994 WL 18630 at *12 (S.D.N.Y. Jan. 21, 1994) (finding that the parties had entered into an employment contract based on the parties' statements and conduct) (citing *R.G. Group Inc. v. Horn & Hardart, Co.*, 751 F.2d 69, 75–76 (2d Cir.1984)). Nonetheless, it must be created by the mutual decision of the corporation and the putative employees. *See generally Reichelt v. Emhart Corp.*, 921 F.2d at 428 (asset purchaser made written offer of employment to some employees of selling company, and seller paid severance benefits to those who did not receive such offers); *Young v. Standard Oil*, 849 F.2d 1039, 1042, 1047 (7th Cir.) (plaintiffs became employees of asset purchaser because they were ex-

pressly offered employment and complied with purchaser's instruction to keep working at their old facility), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988); [17] *Weingart v. Community School Bd. 26*, 71 A.D.2d 901, 902, 419 N.Y.S.2d 618, 619 (2d Dep't 1979) (superintendent not entitled to a writ of mandamus to enforce employment contract where it was not clear there was mutual assent to all terms and conditions). In view of this requirement of affirmative assent—whether explicit or implicit—and the noted principle that a parent is presumed to be separate from its subsidiary, *see* cases cited at p. 863, *supra*, it follows that an employment relationship does not automatically arise between the corporate purchaser of the shares of another corporation and the employees of the purchased corporation. *Cf. Accardi v. Control Data Co.*, 836 F.2d 126, 129 (2d Cir.1987) (stock sale of subsidiary did not cause "termination" for purpose of severance benefits); *DeAngelis v. Warner Lambert Co.*, 641 F.Supp. 467, 471–72 (S.D.N.Y. 1986). *See also Porter v. Beloit Corp.*, 667 F.Supp. 367, 369 (S.D.Miss.1987) (employee of subsidiary may sue parent for its fault without regard to workmen's compensation restrictions) (citing cases). Whether such an employment relationship was created between MCII and some or all of the plaintiffs in this case is subject to genuine dispute.

Plaintiffs, who bear the burden of proof on this issue, note the absence of any explicit offer of employment to them, and the striking contrast in this respect between MCIC's treatment of those RCAG personnel whom it chose to hire for MCII and those whom it decided to let go. Moreover, plaintiffs assert that MCIC decided before the closing not to hire them and that they were never asked to perform any work for MCII, and thus they argue that no employment relationship could have been created even though they were not notified of their termination until one or several days after the closing. Plaintiffs also point out that for the first week after the closing they were paid by checks drawn on RCAG's account, and that their employment

---

**17.** In *Young* one plaintiff declined the purchaser's offer, but this was inconsequential because the former employer's severance plan excluded coverage for employees who were offered employment by the purchaser. *Id.* at 1047.

status for the period in question, including their termination effective May 31, 1987, was recorded on RCAG forms. Finally, plaintiffs note that in response to their attorney's letter demands to RCAG and MCII for payment of additional severance benefits, the two companies offered written justifications that conceded that plaintiffs had been employees of RCAG at the time of termination.

In contrast, defendants appear to contend that plaintiffs were offered and implicitly accepted employment, albeit of brief duration, with MCII. They cite plaintiffs' completion of MCII payroll and benefit plan forms, their placement on the employee database of MCII for two weeks after the closing, and their receipt and retention of various MCII employee benefits, including pension, severance and health insurance benefits. They also claim that MCIC (or MCII) did not decide whether to terminate plaintiffs until after the closing, and they seem to suggest that one or more of the plaintiffs may have performed work for MCII in the brief period of time before they reported to MCII's out-placement services. Finally, defendants note that in a separate lawsuit several of the plaintiffs alleged in their complaint that they had been MCII employees at the time of their termination.

The determination of whether an employment relationship was created with MCII is of course fact-intensive. In the absence of any explicit offer, it is necessary to weigh the parties' dealings with each other with some care. In this case, several facts that might affect the balance are either in dispute or not addressed on the record. For example, although it is conceded that plaintiffs filled out MCII payroll and employee benefit forms and ultimately received MCII benefits, we do not know what, if anything, was said to the plaintiffs, either at the December 1987 orientation sessions or later, concerning MCII's intention to become their employer as of the closing or what conditions would be attached to plaintiffs' receipt of benefits. *Compare, e.g., Young v. Standard Oil*, 849 F.2d at 1042 (describing defendant's communication with plaintiffs regarding employment status after

the sale of the company). As for the timing of MCII's (or MCIC's) decision to terminate plaintiffs, this is in dispute, and whatever one may think as to the plausibility of defendants' assertion that the decision was not made until a few hours after the closing, that question may not be disposed of on summary judgment. Although plaintiffs argue that this issue is immaterial, it may prove to be of some significance given the fact that the other relevant considerations are not entirely weighted on one side of the scale.

In addition, there appears to be some evidence, although of the vaguest sort, to support defendants' contention that one or more plaintiffs did perform some services for MCII. Whether that is the case or not may be significant for the adjudication of those plaintiffs' claims.

In sum, I conclude that the question of whether plaintiffs ever became employees of MCII is subject to genuine dispute, notwithstanding the parties' agreement as to many of the specific historical facts. Accordingly, this aspect of both summary judgment motions is denied.

### (b) *Plaintiffs' Second Theory of Liability for Benefits*

Plaintiffs also press an alternative theory for their entitlement to RCAG severance benefits. In substance, they argue that if they became MCII employees before their post-closing terminations, necessarily they had to cease, as of the closing, being RCAG employees. If so, they say, that amounts to a termination of their employment with RCAG and should have triggered severance benefits since MCII did not give them comparable employment.

 This argument appears to mirror the analysis offered by the *Pippin* plaintiffs in the Ninth Circuit. As noted, the Circuit Court gave this point short shift based on its conclusion that the facts, as proven there, did not demonstrate a "triggering event" for severance payment eligibility. *Pippin v. RCA Global Comm.*, 1992 WL 344962 at *1 (Defts' Exh. 25 at p. 2.) [18]

---

**18.** Defendants argue that the *Pippin* decision, if not claim or issue preclusive, should be given

weight as precedent. This is inappropriate in view of the fact that the *Pippin* decision was

For elucidation, we look to the terms of the RCAG severance policy. The RCAG policy states that the company will pay severance to employees "who are laid off and meet the eligibility requirements" specified by the policy. (Pltffs' Exh. 4 at p. 1, ¶ A.) The policy defines "lay off" to include "a termination of active employment" because of a "[r]eduction in force," "[o]rganizational realignment," "[d]iscontinuance of an operation," "[l]oss of contract or sale of an operation to another company," "[l]ack of work," and "[l]ocation closing." (*Id.* at p. 1, ¶ B1.) [19]

The immediate question is whether any of these provisions applies to the somewhat unusual circumstances of this case, in which RCAG itself was sold to another entity, which, by hypothesis, arranged for all of the employees of RCAG to be transferred simultaneously to the job rolls of another subsidiary.[20] That issue cannot be decided on the current record.[21]

Although each side has moved for summary judgment, we cannot grant such relief unless the relevant terms of the policy are unambiguous on this point or additional proffered evidence demonstrates beyond triable dispute that this language was intended to cover or to exclude the current circumstances. *See, e.g., New York News, Inc. v. Newspaper Guild,* 927 F.2d 82, 84 (2d Cir. 1991) (affirming summary judgment based on unambiguous contract terms); *Crescent Oil & Shipping Serv., Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52–54 (2d Cir.1991) (affirming summary judgment based on extrinsic evidence conclusively establishing meaning of contract); *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990); *American Home Assur. Co. v. Baltimore Gas & Elec. Co.,* 845 F.2d 48, 50–51 (2d Cir.1988); *Fortune v. Medical Assocs.,* 803 F.Supp. 636, 641 (E.D.N.Y.1992) (summary judgment is appropriate when the terms of an insurance contract are unambiguous).

The quoted provisions of the RCAG policy defining a benefit-triggering layoff have generally understood meanings. Nonetheless, their applicability or lack of applicability to the particular circumstances of this case is not self-evident. Otherwise stated, reasonable triers of fact could disagree as to whether any of the definitions would apply here.

issued under Ninth Circuit Rule 36–3, which provides that "[a]ny disposition that is not an opinion or an order designated for publication under Circuit Rule 36–5 shall not be regarded as precedent and shall not be cited to or by this court or any district court of Ninth Circuit, either in briefs, oral argument, opinions, memoranda or orders, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel." *See also* Ninth Cir. Rules 36–1, 36–2, 36–5. The Second Circuit, which has a comparable rule, *see* Second Cir. Rules 0.23, honors these types of prohibitions from other circuits, and thus cites unpublished opinions from sister circuits only if the applicable circuit rule permits such citation. *See, e.g., Lugo v. Keane,* 15 F.3d 29, 31 (2d Cir.1994) (citing unreported Sixth Circuit decision, but noting "citation not prohibited by local rules"); *Rasmussen v. General Dynamics Corp.,* 993 F.2d 1014, 1017 (2d Cir.1993) (citing unpublished Fourth Circuit case; Fourth Circuit rules permit such citation. *See* Fourth Cir. IOP 36.6.) *See also Schueler v. Roman Asphalt Corp.,* 827 F.Supp. 247, 253 & n. 8 (S.D.N.Y.1993).

**19.** This list is apparently intended to be exclusive. (*See id.* at ¶ B2.)

**20.** The policy goes on to exclude benefits for an employee laid off by RCAG but then given comparable employment by RCAG, an affiliated company, or a company to which RCAG has lost a contract or "sold a business operation in which the employee has been working." (*See* Defts' Exh. 18 at p. 2, ¶¶ 5(a), (b).) Even if otherwise potentially applicable, this exception plainly would not apply here since plaintiffs were not offered comparable employment by MCII.

**21.** The parties do not discuss the standard of review that the court should exercise in addressing the administrator's interpretation of the plan documents. Ordinarily review is to be *de novo* unless the plan clearly vests interpretive discretion in the administrator. *See, e.g., Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). In this case the plan states that "[t]he Vice President, Employee Relations, or his designee, will render any interpretation of this Policy that may be required." (Pltffs' Exh. 4 at p. 4.) Whether this language is sufficient to invoke judicial deference is open to possible question, *compare Masella v. Blue Cross & Blue Shield of Connecticut,* 936 F.2d 98, 103 (2d Cir.1991) (citing examples of plan language that vested discretion in administrator), but we need not address that matter at present since (1) defendants have not sought such deference and (2) the administrator appears not to have squarely addressed the interpretive issue raised by plaintiffs' second theory of benefit entitlement.

That is sufficient to demonstrate that the provisions in question are, for our purposes, ambiguous. *See, e.g., Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 946 (2d Cir.1980); *State Street Bank & Trust Co. v. Mutual Life Ins. Co.,* 811 F.Supp. 915, 921 (S.D.N.Y.1993) (summary judgment not appropriate if the contract provision is subject to reasonable alternative interpretations); *Auto Caravan Corp. v. Insurance Co. of North America,* 1988 WL 74999 at *1 (S.D.N.Y. July 8, 1988). Moreover, neither side has proffered any extrinsic evidence on their respective motions demonstrating whether the plan was or was not intended to cover a situation involving the stock sale of the employer and sponsor itself.

In finding the plan provisions to be ambiguous on this point, I rely on the specific language of the plan. Thus I note that the caselaw cited by both sides on this point is distinguishable because the terms of the plans at issue in those cases were significantly different. For example, the recent decision of the Eleventh Circuit in *Bedinghaus v. Modern Graphic Arts,* 15 F.3d 1027 (11th Cir.1994), cited to us by plaintiffs, involved a severance plan that plainly and unambiguously applied to the circumstances of the plaintiff class. Specifically, the plan covered an employee "discharged as a staffer for reasons other than cause," and the term "staffer" covered employees of the sponsor's subsidiaries, including defendant Modern Graphic Arts ("MGA"). Since the plaintiffs had been employed by MGA, and their employment with MGA ceased after the parent sold most of MGA's assets to another company, the plan provision for benefits was triggered even though plaintiffs were hired by the asset purchaser. *See id.* at 1027–30. In contrast, the RCAG plan does not contain such an expansive coverage provision, and thus is not triggered by all layoffs except for cause; instead, it specifies several categories of layoffs that will be covered. Whether the circumstances encountered by plaintiffs fit within any of these categories is a closer question, and since a colorable argument could be made either way, summary judgment is inappropriate.

By the same token, the Second Circuit's decision in *Bradwell v. GAF Corp.,* 954 F.2d 798 (2d Cir.1992), which is prominently relied upon by defendants, is also distinguishable. The severance benefits in that case were payable to employees laid off "because of lack of work," but the plaintiffs there remained in their jobs when the employer sold the facility at which they worked. As the Circuit Court noted, "Where an employee is kept in his or her job because, despite a change in ownership, there is no lack of work, that employee cannot accurately be described as 'permanently laid off because of lack of work.' " *Id.* at 800. *See also Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1141–42 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994) (severance plan not applied to employees who retained job with purchaser of their division; court looks to employer's consistent past practice in interpreting severance plan). That is, of course, not the case here. In contrast, the plain language in this case is far more susceptible to an interpretation that covers the plaintiffs' situation if it is assumed that they ceased being RCAG employees at the closing.

In sum, we must conclude that there is a triable issue of fact as to the meaning and applicability of those provisions, thus barring entry of summary judgment for either side on plaintiff's alternative theory.

### 4. *Plaintiffs' Claim of a Fiduciary Breach (Count II)*

 Plaintiffs' remaining claim for improper denial of benefits is asserted under 29 U.S.C. § 1104, which in substance imposes a fiduciary obligation of care and loyalty on the administrator of an ERISA plan. *See also* 29 U.S.C. § 1002(14)(A) (describing administrator as fiduciary); 1109. Plaintiffs argue that the refusal of RCAG to pay severance benefits to plaintiffs under its plan constitutes a breach of its fiduciary duties. (*See* Pltffs' Memorandum at 50.)

This claim appears to be, in substance, a reiteration of plaintiffs' claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B). Insofar as plaintiffs suggest that they may recover on a separate, fiduciary breach theo-

ry, they appear to misconstrue the relevant statutory provisions. Section 502 of ERISA, 29 U.S.C. § 1132, the general civil enforcement provision, specifies the grounds for relief and the nature of the relief that plan participants may pursue, and it makes no reference to a separate fiduciary-breach claim by a participant on his own behalf. There is a section that deals explicitly with liability for fiduciary misconduct, *see* 29 U.S.C. § 1109(a), and it makes such a misbehaving fiduciary "liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which may have been made through use of assets of the plan by the fiduciary. . . ." This section also provides for the fiduciary to "be subject to such other equitable or remedial relief as the court may deem appropriate." *Id.*

The Supreme Court has held that these provisions are intended to authorize relief to the plan itself, and are not a separate source of entitlement to relief for individual plan participants. *See Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140–44, 105 S.Ct. 3085, 3089–91, 87 L.Ed.2d 96 (1985) (beneficiary not entitled to damages from fiduciary for breach of duties). This conclusion is particularly appropriate in the present context since section 502 provides a specific remedy for plan participants who are denied benefits to which they are entitled. *See, e.g., Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) ("*Russell* therefore bars plaintiffs from suing under Section 502(a)(2) because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan."); *Ludwig v. NYNEX Service Co.,* 838 F.Supp. at 783 n. 28 (§ 502(a)(2) does not create private cause of action for plaintiffs asserting breach of fiduciary duty under ERISA Section 409) (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. at 136, 148, 105 S.Ct. at 3087, 3093). Given the availability of a statutory remedy upon the showing of an entitlement to benefits, there is no reason to define a separate claim—not supported by statutory language—that would provide the same relief for the same wrong.

In short, plaintiffs' second claim must be dismissed. *See, e.g., Lee v. Burkhart,* 991 F.2d at 1009; *Ludwig v. NYNEX Service Co.,* 838 F.Supp. at 783 n. 28; *Donnelly v. Bank of New York Co.,* 801 F.Supp. 1247, 1253–54 (S.D.N.Y.1992), *aff'd mem.,* 2 F.3d 403 (2d Cir.1993).

### 5. Plaintiffs' Non–Disclosure Claim

The remaining claim, asserted by thirteen plaintiffs, is based on the assertion that RCAG improperly failed to provide various plan documents to plaintiffs' counsel. Section 104 of ERISA, 29 U.S.C. § 1024, obligates the plan administrator, on request, to furnish a plan participant "a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). *See, e.g., Saladino v. ILGWU Nat'l Retirement Fund,* 754 F.2d 473, 475 (2d Cir.1985); *Plotkin v. Bearings Ltd.,* 791 F.Supp. 383, 384 n. 2 (E.D.N.Y.1992). If the administrator "fails or refuses to comply within 30 days with a request for any information which [the] administrator is required by this subchapter to furnish to a participant," and his failure to do so is not attributable to reasons beyond his control, section 502 authorizes the court, in its discretion, to award the requesting party "up to $100 a day from the date of such failure or refusal. . . ." 29 U.S.C. § 1132(c)(1).

The language of the statute makes it clear that such an award is discretionary with the court. *See, e.g., Cappiello v. NYNEX Plan,* 1994 WL 30429 at *5 (S.D.N.Y. Feb. 2, 1994); *Kascewicz v. Citibank, N.A.,* 837 F.Supp. 1312, 1320 (S.D.N.Y. 1993). In determining whether to impose such an award, the courts have generally looked to such matters as the administrator's good faith or lack of it and whether the requestor was prejudiced by the administrator's conduct. *See, e.g., id.* at 1321–22 (concluding that prejudice is just one factor, although a significant one, in determining if sanctions under § 502(c) are appropriate); *Cappiello v. NYNEX Pension Plan,* 1994 WL 30429 at *5 ("no sanctions are warranted here because plaintiff has failed to allege

harm or bad faith") (citations omitted). *See also Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 743 (7th Cir.1991) ("the employer must have acted in bad faith ... before recovery for procedural violations is warranted"); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 847 (11th Cir. 1990); *McFaul v. Loews Corp.,* 1993 WL 541778 at *4 (S.D.N.Y. Dec. 30, 1993); *Plotkin v. Bearings Ltd.,* 777 F.Supp. at 1107–08; *Stenke v. Quanex Corp.,* 759 F.Supp. 1244, 1248 (E.D.Mich.1991); *Paris v. F. Korbel & Bros., Inc.,* 751 F.Supp. 834, 839–40 (N.D.Cal.1990); *Kelly v. Chase Manhattan Bank,* 717 F.Supp. 227, 233 (S.D.N.Y.1989) ("penalties will not be imposed on a plan administrator absent a showing by the plaintiff that he has suffered some degree of harm resulting from the delay") (citing cases); *Bova v. American Cyanamid Co.,* 662 F.Supp. 483, 490 (S.D.Ohio 1987); *Chambers v. European American Bank & Trust Co.,* 601 F.Supp. 630, 638–39 (E.D.N.Y.1985).

▬ In this case plaintiffs' counsel initially requested copies of "all plan documents and other plan information" by letter dated November 23, 1988. (Pltffs' Exh. 36 at p. 3.) Although at the time plaintiffs were no longer employed by RCAG, and the corporation was claiming that they were no longer participants, their request triggered the administrator's disclosure responsibilities under section 104 because the question of their eligibility for benefits was at least arguable and hence they were "potential participants." *See, e.g., Finz v. Schlesinger,* 957 F.2d 78, 82 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992). *See also Kascewicz v. Citibank, N.A.,* 837 F.Supp. at 1312.[22]

The RCAG administrator did respond by sending counsel a copy of the policy (Pltffs' Exh. 38) by letter dated January 16, 1988. A further exchange of letters led to the production as well of a copy of the summary plan description. (*See* Pltffs' Exh. 42.) To the extent that plaintiffs' counsel's subsequent letters also made more specific requests for other items, including all documents relating to the termination of plaintiffs by RCAG and the termination of the plan, as well as all filings with the Department of Labor, and documents reflecting the service credit of each claimant (Pltffs' Exh. 44), it appears that the administration did not comply or complied very belatedly.

Although defendants' response to plaintiffs' counsel's requests was not complete and did not meet the statutory thirty-day requirement,[23] some of the requests exceeded the scope of section 104. Specifically, that provision makes no reference, explicit or implicit, to documents reflecting the employees' termination by the employer. Such information is presumably available from the employer, and ERISA does not expose the plan administrator (even if it is the employer wearing an administrator's hat) to penalties for failing timely to provide such documents to the participant.

As for documents reflecting the termination of the plan, it is true that defendants failed to provide that information, but section 104 requires production only of the terminal report, *see* 29 U.S.C. § 1024(b)(4), a document that must be filed with the Secretary of Labor upon termination of the plan. Since it is conceded that defendants never prepared such a report, they cannot be held liable for failing to give plaintiffs a copy. It also bears noting that, for reasons we have already discussed, the record demonstrates no termination of the plan, and hence it follows that defendants had no documents reflecting such a termination.[24]

---

**22.** Also, the fact that the request was made by the former employees' attorney does not exempt it from the requirements of the statute. *See, e.g., Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 744 F.Supp. 1061, 1066 (M.D.Ala.1988), *aff'd,* 891 F.2d 842 (11th Cir.1990); *Porcellini v. Strassheim Printing Co.,* 578 F.Supp. 605, 611 (E.D.Pa.1983).

**23.** It is not clear whether the provision of the severance policy on January 16, 1989 came within thirty days of receipt of plaintiffs' request. At most it was several weeks later.

**24.** Plaintiffs argue that defendants should have provided a copy of the Stock Purchase Agreement and the January 1988 termination resolution by the RCAG Board since defendants have argued that the agreement and resolution provided the basis for inferring a termination of the plan. It appears that a copy of the agreement was supplied to counsel prior to his request and

As for the evident delay in supplying the summary plan description, plaintiffs make no showing that they were prejudiced by this failing. Moreover, I see no basis to infer that the failure to provide it earlier reflected bad faith rather than possible confusion or sloppiness on the part of the administrator. Particularly in view of the reasonably prompt provision of the policy itself—which contains all the material terms of the plan—there is no basis to suggest that defendants either sought to conceal material facts from defendants or succeeded in doing so.

 Under all of the circumstances, I decline to hold either defendant liable for civil penalties under 29 U.S.C. § 1132(c)(1).

### CONCLUSION

 For the reasons stated, defendants' and plaintiffs' motions for summary judgment are granted in part and denied in part. Specifically, plaintiffs' second, third and fourth claims are dismissed. As for the first claim, partial summary judgment is entered holding that the RCAG severance plan was not terminated prior to May 30, 1988. There remain for trial the following questions:

1. Did the plaintiffs remain RCAG employees until their post-closing termination?

2. If not, was their departure from RCAG a "layoff" within the meaning of the RCAG severance benefit plan?

The court will conduct a pre-trial conference with counsel on **Wednesday, April 20, 1994 at 10:00 A.M.** in Room 503 of the Courthouse for the purposes of scheduling the trial of these matters and determining the procedures for that trial.

**SO ORDERED.**

in a different context, but even if this does not count as an adequate response to the later request on behalf of these plaintiffs, defendants' failure to provide the agreement and resolution does not, on the current record, reflect a violation of section 104 since they did not constitute a terminal report and neither terminated the plan nor purported to require such a termination, notwithstanding the later arguments to the contrary by defendants' counsel.